## McKnight v. Broadway Investment Company.

(Decided March 16, 1912.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Contracts—Specific Performance—Mutual Agreement.—It is elementary that specific performance of a contract will not be decreed except upon a completed contract. "There can be no contract unless the minds of the parties have mutually agreed, and specific performance will be denied when this requisite is lacking.

Equity requires a clear, mutual understanding and a positive assent on the part of each party."

2. Courts—Compelling Specific Performance.—To authorize a court of equity to exercise its jurisdiction compelling the specific enforcement of a contract it must be reasonably certain as to its subject matter, its stipulations, its purposes, its parties and the circumstances under which it was made.

3. Specific Performance.—A specific performance cannot be decreed of a contract to give or renew a loan which does not specify the terms for which it is to be given or renewed.

4. Leasing Real Estate—Obligation of Contracting Parties.—It is not enough that there should be a writing signed by the grantor merely stating that he proposed to lease certain premises upon terms to be mutually agreed upon, but the memorandum relied upon must contain the terms, that is, it must furnish the evidence of the terms of the lease, the time it is to begin, the conditions upon which it is to be executed, the various provisions setting forth the respective rights, duties and obligation of the contracting parties. These things are of the very essence of the contract and they must necessarily be reduced to writing in order to take the case out of the statute.

KOHN, BINGHAM, SLOSS & SPINDLE for appellant.

TRABUE, DOOLAN & COX for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

W. H. McKnight is the owner of a lot 122 by 170 feet on the northwest corner of Fourth and Broadway, in Louisville, Kentucky. The Broadway Investment Company is a corporation engaged in dealing in real estate in the city of Louisville. George H. Fisher & Co. are real estate agents in Louisville. Sometime in the midsummer of 1909 W. H. McKnight was approached by a representative of George H. Fisher & Co. and requested to put a price upon his real estate on Fourth and Broadway. He declined to do so. Shortly thereafter the same agent again inquired of him to know if he would lease said property, and he expressed a willingness to do so if satisfactory arrangements as to rental and terms could be made. Through the efforts of George H. Fisher & Co. negotiations were started between W. H. McKnight and the Broadway Investment Co., looking to the leasing of the former's property by the latter.

In the course of their dickering, McKnight wrote and delivered to Fisher & Co. the following proposition:

"Louisville, Ky., Aug. 12, 1909.

"Messrs. Geo. H. Fisher & Co.,

"City.

"Gentlemen:

"I propose to name the very lowest terms upon which I would make a lease for my two lots on the northwest corner of Fourth avenue and Broadway for the term of ninety-nine (99) years, as follows:

"For the first five years, I will accept the sum of ten thousand ($10,000) dollars per annum, payable monthly in advance on the first of each and every month.

"For the second five years I will accept the sum of eleven thousand five hundred ($11,500) dollars per annum, payable monthly in advance on the first of each and every month.

"For the first term of ten years succeeding the two terms of five years mentioned above, I would accept fifteen thousand ($15,000) dollars per annum, payable monthly in advance on the first of each and every month.

"For the remainder of said term of lease I would accept eighteen thousand ($18,000) dollars per annum, payable monthly in advance on the first of each and every month.

"The lessee will be required to pay all taxes, city, county and State, and their proportion of all taxes for the year in which possession of property is given, and all other charges brought against the property by the acts of the lessees during the entire term of the lease.

"The lessor shall have the right to remove from the houses now upon the lots, the bath tubs, stoves, windows, chandeliers, electric light and gas fixtures, and all other things he cares to remove. All the rest of the wreckage would belong to lessee.

"In order to secure the payment of the rent until the improvements on the lots to cost not less than two hundred thousand ($200,000) dollars are made, sufficiently durable and costly to insure the monthly payments as they fall due, an acceptable bond would be required upon the acceptance of this proposition.

"At the expiration of the lease the lessee shall have the right to remove all improvements he puts upon the lots or sell them to the owner or owners if they can agree upon the terms of sale.

"There will necessarily be some details to be agreed

upon between the parties and put in the lease that are not mentioned in this proposal in case it is accepted.

"August 28, 1909.

"Respectfully submitted,

"W. H. McKNIGHT."

This proposition is accepted. Lease to be executed as per form drawn by us and submitted to Mr. McKnight through Geo. H. Fisher Co.

"BROADWAY INVESTMENT CO.,

"H. J. SCHEIRICH, President."

It appears that this proposition, as made, was rejected by the investment company, and a counter-proposition submitted; negotiations were continued, and finally, about August 28th, Mr. McKnight agreed to eliminate certain of the conditions set up in the proposition of August 12th. The conditions eliminated are indicated by a line drawn through that portion of the proposition in which they are set up, and as it is claimed that the proposition with these provisions eliminated was accepted, they are omitted and treated as never having been incorporated therein. According to the testimony of the representatives of the investment company, and also the real estate company, the modified proposition was accepted by the investment company on August 30th. Thereafter the parties met at the office of the Broadway Investment Company and discussed the details of the proposed trade. Several changes were made in the proposed lease at the suggestion of Mr. McKnight and, according to the testimony of the representatives of the investment company and Hampton, the agent of the Fisher Company, Mr. McKnight stated, at the conclusion of this conference that the terms of the proposed lease were entirely satisfactory to him, and he took the paper away with him to have it executed by his wife. On the other hand, he testifies that, while in the particulars indicated by corrections made on the proposed lease it was satisfactory to him, there remained open two questions. * * * First, he was wanting some substantial assurance that the investment company was financially able to erect such a character of building upon his lot as would insure a net income sufficient to pay the annual rental; and second, that he was wanting security of a sufficient value to guarantee the payment to him of the rentals that would accrue before a building could be erected upon his property. That the representatives of the investment company, in the course of the conference, failed to satisfy him upon this point, and that he left for

the purpose of conferring with his attorney, in the hope that unsettled matters between himself and the investment company might be adjusted.

On the day following a representative of the Geo. H. Fisher Co. notified the investment company, according to their testimony, that McKnight was not satisfied, and, as a result of this notification, a meeting was held at McKnight's place of business, in which again the security for rents and the ability of the investment company to erect a building was discussed. Here, again, the testimony is in direct conflict. That offered by the investment company is to the effect that an arrangement was made at this meeting that was entirely satisfactory to Mr. McKnight; while the testimony offered by Mr. McKnight is that it was not satisfactory at all. On the day following, McKnight notified the investment company that negotiations were ended. Thereafter the investment company tendered him a lease, and he having declined to execute same, suit was brought to enforce the specific performance of the writing dated August 12, 1909, but which was in fact alleged to have been executed August 28, 1909. Much proof was taken by each side, the case was submitted, and upon final hearing the chancellor adjudged the plaintiffs entitled to the relief sought, and held that a binding contract had been entered into by McKnight with the investment company, and that, under its terms, he was required to execute the lease as per said contract. McKnight appeals.

Many grounds are relied upon for reversal, but from the conclusion which we have reached only those will be noticed which are essential to a determination of the rights of the parties as gathered from the record.

It is elementary that specific performance will never be decreed, except upon a completed contract; or, as stated in American & English Encyclopedia of Law, Vol. 26, p. 21, "As it is elementary that there can be no contract unless the minds of the parties have met and mutually agreed, specific performance will be denied where this requisite is lacking. Equity requires a clear, mutual understanding and a positive assent on the part of each party." The first question, then, for determination is, did the minds of the parties in this case meet? The writing relied upon by appellant shows that it is merely a proposition or offer to try and negotiate a trade, and necessarily, if the details of the proposed trade were not worked out to the satisfaction of both parties, the minds did not meet. They were agreed that

the lease should run for ninety-nine years and that the annual rentals, during the periods into which the proposed lease was divided, should be as stated in the writing. An acceptable bond was to be given to McKnight to insure the payment of his rents accruing before the contemplated improvements were erected upon the lot, and the details referred to in the writing were to be agreed upon. Nothing is said in this proposition about the insurance, the application of the insurance money in the event of the destruction, partial or total, of the property by fire, the use to which the property is to be put, or the date upon which the lease was to begin. It is in evidence that one of the buildings upon the property was leased for some two or three years from the date of this writing; and it is also in evidence that the representative of the Fisher Company had given McKnight assurance that he could arrange matters with the holder of this unexpired lease to his, McKnight's, satisfaction. Whether the disposition of this unexpired lease is one of the details referred to or not can not be told. In fact, just what requirements Mr. McKnight had in mind when he made this proposition could only be known when the character of lease which he was willing to execute was drawn. In the form in which this proposal was submitted, the most that the investment company could have done would have been to accept it in terms in order to create a binding contract. It must have been agreed by the investment company that it would comply with the requirements of McKnight as to the kind and character of bond to be executed and consent that the details regarded by McKnight as essential to the completion of the contract should be incorporated in the lease, for, in order to create a binding obligation, the proposition as made by him must be accepted in terms. Neither the investment company nor anyone else is authorized to say for McKnight what would be to him an acceptable bond or what terms he should regard as necessary, in addition to those specified in the proposition, to have incorporated in the lease. It was his property, and before he could be compelled to make disposition of it there would have to be incorporated in the lease such reasonable provisions as he regarded necessary and essential for his protection and security.

Realizing the infirmity in the writing, that is, that it could not be enforced as written, the representatives of the investment company sought to show that, in a sub-

sequent meeting at its office, the necessary details referred to in the writing were agreed upon, and the conditions called for in the bond to secure the rent complied with. The evidence is conflicting upon this point and, with the evidence thus conflicting, the chancellor is asked to decree a specific performance. The general rule, as stated in 26 American & English Encyclopedia of Law, 32, is that, "to authorize a court of equity to exercise its jurisdiction compelling the specific performance of a contract, it must be reasonably certain as to its subject matter, its stipulations, its purposes, its parties, and the circumstances under which it was made."

Applying this test to the facts in the case before us, we find that there are many essential elements of the contract of leasing that are involved in doubt. The time when it is to commence is not fixed in the writing, and the evidence upon this point is conflicting. In a former proposal, submitted by appellant, March 1st is named; while appellees suggest June first. Appellees testify that it was agreed in a conversation in the office of appellee company on August 31st that the lease should begin June first. Appellant denies that there was any such agreement. "A specific performance can not be decreed of a contract to give or renew a lease which does not specify the term for which it is to be given or renewed." 36 Cyc., 598.

However, the point that no time was agreed upon for the commencement of the lease was not urged as the principal ground by appellant for his refusal to carry out the trade. His chief objection to concluding the arrangement was, that satisfactory evidence was not furnished him that the investment company had the financial ability to erect a building such as he deemed necessary in order to produce an income sufficient to meet the rentals which would be due him, and that the securities offered to secure the rent until such a building should be erected were not satisfactory. The evidence shows that, at the time these negotiations were pending, the investment company had no revenue producing property at all. Its holdings consisted entirely of property near that involved in this litigation upon which it was erecting a building of considerable size; but at that time it was not completed. It was encumbered to the extent of perhaps $75,000; and while, according to the evidence, it has since proven to be a profitable investment on the part of the company, the success of the venture was at that time

problematical, or, at least, so regarded by Mr. McKnight. The company had no bonds or stock other than its own, and while the principal stockholders in the company testify that they were financially able to raise the necessary money with which to erect a building of that size, character and architectural beauty which Mr. McKnight deemed neessary in order to secure the payment of his rentals, there was nothing in the contract whereby they were obligated to do so. This was a valuable property, and in its disposition appellant was endeavoring to provide for his wife and family an income extending over a period of time so long that it practically amounted to a sale. It was, then, of the highest importance to him that the details of the transaction should be looked after with great care. It is apparent that appellant did not understand, either when he signed the proposal fixing the term and the rentals, or when he went to the office of appellee company for further conference over the terms of the proposed lease, that he was entering into a binding obligation for the disposition of this property. The best evidence that he did not so regard it is found in the fact that, although it is claimed that this acceptance of his proposal was endorsed on the back thereof on the 30th day of August, when they met at appellee's office on the 31st of August for further conference, neither the representatives of appellee nor Hampton, the agent of Fisher & Co., said anything that would indicate that the contract was closed. On the contrary, they were there for the very purpose of working out the details of the lease which it was proposed should be executed. Appellant had with him a copy of the lease which appellees had furnished for him, and which he was unwilling in terms to accept. He made several suggestions as to changes desired therein, and discussed on that day a bond to secure the rentals until a building of the character indicated by him should be completed upon the ground. Nor is that all. On the day following all the parties to this transaction find it necessary to have another conference at the office of appellant in his place of business, and again the character of bond, the securities that shall be pledged, is discussed, thus giving further evidence to the understanding of appellant, that they had not reached a point in their dealings upon which they were agreed as to the terms and conditions upon which the lease was to be executed.

The members of appellee company were young, en-

ergetic business men; Hampton, the agent who represented Fisher & Co. in the transactions, and seems to have been conducting his negotiations so as to be able to claim that he was representing each party, was likewise a man in the prime of life; while appellant was shown to have been at that time more than eighty years of age and enfeebled by the ravages of disease. From the manner in which he testified, it is apparent that he thinks slowly. But we are very much impressed with one fact, which stands out prominently in his testimony, and that is that he had an eye single, during all of these conferences, to see to it that the rentals agreed upon were properly secured. He declined to accept stock in the investment company as a guaranty that his rentals would be paid, and although appellees' testimony is to the effect that, at their last conference, they agreed to furnish and he agreed to accept other securities in lieu thereof, his evidence flatly contradicts this statement, and his subsequent conduct strongly supports his testimony in this particular. He testifies that when he quit the conference on August 31st he went direct to his lawyers for the purpose of seeing if they could devise some plan by which the representatives of appellee company could be made to demonstrate that they were able to carry out the contract which they were proposing to make with him. If he had then closed the deal or understood that he had made a trade with them, why the necessity of a conference with his lawyers? If the securities were satisfactory to him, why did he demand other securities? If he was satisfied with their ability to erect the character of building which he understood, and they assured him, should be erected upon this property, why was he refusing to go ahead with the trade? The answer to all of these questions is found in the fact that he never understood that they had come to an agreement, and he never intended that the proposals which he was making to them were to be in any wise binding upon him until their negotiations had reached a point where he and they, as the representatives of the company, had reached a common understanding. Thus, we have presented a case where terms of vital importance to the parties to the contract must be gathered, not from any writing executed by them, but proved wholly by parol; and upon this parol evidence, conflicting throughout and not at all satisfactory upon any material point, the chancellor is asked to decree a specific performance. We are of

opinion that no such case is here made out as would warrant the exercise of this extraordinary power, for it is apparent that the minds of the parties never met. The conditions which appellant was demanding before he was willing to enter into a lease of his property were not complied with, nor was he satisfied that the appellees were able to comply therewith, and because of this inability on their part to satisfy him, he refused to execute the lease.

Passing the question as to whether or not the endorsement on the proposition is in terms sufficiently explicit to warrant the court in holding that it was an acceptance, we take up the only remaining question which we deem it necessary to consider. It is the contention of appellant that the written proposition which is made the basis of this suit is not a sufficient memorandum of the transaction to take it without the statute; while appellee contends that, inasmuch as the writing describes, the lot to be leased, the length of the term, and the annual rental, it is 'sufficient to meet the requirements of the statute, as interpreted by this court. So much of the statute as is material to the question here involved is as follows:

"No action shall be brought to charge any person * * * upon any contract for the sale of real estate or any lease thereof for a longer term than one year * * * unless the promise, contract, agreement, representation, assurance or ratification, or some memorandum or note thereof be in writing, and signed by the party to be charged therewith, or by his authorized agent; but the consideration need not be expressed in the writing; it may be proved, when necessary, or disproved by parol or other evidence."

In the numerous cases that have come before this court involving the application of this statute, various phases of its application have been considered. In the early case of Fowler v. Lewis, 3 A'. K. Mar., 444, the court said:

"Since the adoption of this statute the contract must be in writing, and that writing must be complete in itself. It is not competent for the party claiming the benefit of such contract to show, that part only was reduced to writing, and then to supply the residue by parol evidence. The evidence to supply one part of the contract must be of the same grade with that which proves the

residue, and that, according to the statute, must be in writing, at least so far as it imposes any obligation on the party to be charged therewith.''

In the later case of Kay v. Curd, 6 B. M., 100, the court said:

''The principles recognized in this and numerous other cases is, that parol testimony can not be introduced to establish the terms. That to prevent the evils arising from the introduction of such testimony, was the great object of the statute.    *    *    *

''But without adverting to other cases, in which the construction of the statute in regard to contracts for the sale of land, has been involved, it will be sufficient to say, that we consider the rule as settled, that the terms of the contract must be in writing, or in other words, that the writing must so far embrace the contract, that it may be specifically enforced, without the aid of parol testimony.''

The principle announced in these cases has been followed and approved in numerous other cases in which similar questions have arisen. In Campbell v. Preece, 133 Ky., 572, after quoting the statute, this court said:

''It is not necessary to the validity of the contract that it shall be in writing. If there be a written memorandum of it, signed by the party to be charged, it is taken out of the statute. Nor is it necessary that the memorandum be contemporaneous with the contract. If it be executed subsequently, and ratifies the contract, it is sufficient. The statute pertains to evidence of the contract—not to its validity. While it follows that, if the required evidence of the contract be wanting, its enforcement is denied, and the contract is said to be void, it is void only because of the lack of legal evidence of its existence.''

Thus, while here, it is true, the court says that it is not necessary for the contract to be in writing, and that all that is necessary is that there should be some memorandum of it, when these statements are read in connection with the statements in the latter part of the opinion from which we have quoted, it is apparent that the evidence of the contract, that is, the terms thereof, must be in writing. It is not enough that there should be a writing, signed by the grantor, merely stating that he proposed to lease certain premises, describing the premises, upon certain terms to be mutually agreed upon; but the

memorandum relied upon must contain the terms—it must furnish the evidence of the terms, for this is the very purpose for which the statute was enacted. The terms of the lease, the time it is to begin, the conditions upon which it is to be executed, the various provisions setting forth the respective rights, duties and obligations of the contracting parties, are of the very essence of the contract, and they must necessarily be reduced to writing in order to take the case out of the statute. These are the pivotal points upon which the question of leasing would turn. The statute expressly provides that the consideration need not be stated in writing. It may be proven by parol; and since the consideration may be shown by parol, under appellees' theory, all that would be necessary to state would be that an offer to lease was made in writing and accepted, and all of the terms and conditions might be proven by parol. If such a rule obtained, courts, when called upon to enforce the specific performance of contracts, would be compelled to rely upon the uncertain, and frequently warped and biased memories and recollections of witnesses. When it is considered that this is the very evil to correct which the statute was passed, it is apparent that this contention is not sound.

Camp v. Moreman, 84 Ky., 635, in no wise conflicts with the views herein expressed. There every essential element of the contract was proven by the two writings which the court construed as forming one contract.

In Bell v. Offutt, 10 Bush, 632, a verbal contract was made about a matter which was enforceable as a parol agreement. It was agreed that it should be reduced to writing. The defense was not offered that the contract was not made as alleged, but merely that, because it was understood that it was to be reduced to writing, and this was not done, one of the parties sought to be excused. The court held, that the contract, being binding, it was immaterial whether it was reduced to writing or not.

In Slade v. Lexington, 141 Ky., 214, Central Trust Co. v. Wabash R. R. Co., 29 Fed., 546, and Schmidt v. L. & N. R. R. Co., 101 Ky., 441, the opinion of the court is rested upon the fact that these contracts involved matters of public interest, and being such, they were subject to the control of the courts, and the agreements, when the original contracts were entered into for extensions or renewals, upon stipulated or agreed terms, were en-

forced because necessarily subject to the supervision of the court. A distinction is made between contracts between private citizens, dealing with matters of purely personal or private interest, and contracts between municipalities and public service corporations with reference to the operation of the latter. In the former class of cases the court has no power to interfere with the exercise by the parties of their free judgment in the making of their contracts; whereas, in the latter class of cases, the interests of the public demand that all such contracts be made with due regard to the interest and welfare of the public, and hence are, to a greater or less degree, necessarily subject to the supervision of the court. Bates v. Harris, 144 Ky., 399, is not applicable; and other authorities cited and relied upon by appellees are not in conflict with the principle herein announced.

The most that this court has done in any of its opinions dealing with this subject has been to hold two propositions: First, that the consideration need not be expressed (and this is so held because the statute expressly authorizes it); and second, that where the description of the land in the memorandum is not full and explicit, yet is capable of being ascertained with accuracy and absolute certainty, such description has been held to be sufficient, and parol testimony allowed to identify the property. But it is said that, inasmuch as, in Campbell v. Preece, supra, this court said that "the note or memorandum required by the statute is such written declaration of the parties to the agreement as will relieve the court from relying upon parol evidence to ascertain the subject of the contract. When the subject is established by a sufficient writing, there is then such evidence of the contract upon that score as satisfies the statute; and, if the contract be then established by the proof, it may be enforced. Nor is it necessary that the terms of the contract, in so far as they constituted part of the consideration, be stated in the writing, or, if stated therein, that they be proved as stated," therefore the requirement that a sufficient bond be executed in order to secure the rents falling due before the erection of the proposed building on the property was completed, and the further security guaranteeing that the appellee company would erect a building of the character indicated, were part and parcel of the consideration. Not so, however. They

were conditions which had to be satisfied before a contract of leasing could be entered into.

Nor could the time when the lease was to begin by any possibility be considered a part of the consideration. Not only so, but the writing in question clearly shows that no contract had been made or could be made, even by the acceptance of the proposition by appellees, for the reason that it provided that certain other necessary details would have to be agreed upon in the preparation of the lease. Now, clearly, if it was agreed that all of the necessary details were agreed upon, and there was no dispute about this fact, then the court might go ahead and direct a specific performance. But where the evidence upon the material points at issue is conflicting, the court would not be authorized to decree a specific performance, even if the obstacle of the statute of frauds was removed.

We have been unable to find just such a case as is here presented, but the principle upon which all cases rest, where it has been held that a contract is unenforceable because within the statute, applies with peculiar force to the facts in this case. To the proposition of August 28th there was a qualified acceptance, which was followed up by the tender of a lease containing terms and provisions not found in the proposition at all. This lease was rejected by appellant, and certain changes and alterations demanded, and, according to appellees, the real terms of the contract were agreed upon on August 31st, or, at the latest, on September 1st, while appellant says that they never came to a final agreement. Read in the light most favorable to appellee, the proposition was but an agreement to lease if satisfactory terms could be agreed upon. The time and rental alone are fixed absolutely by the writing, and there is not even a suggestion that the other terms and provisions had even been discussed, much less agreed upon, at that time. The efforts of all parties up to August 28th had been directed toward arriving at an understanding as to the amount of the rental, and the proposition is no more than a statement that the rentals therein povided for will be acceptable when they are secured and the necessary details agreed upon. Until these necessary terms were agreed upon there was no lease. A writing, to be the basis of a contract, must be mutually binding upon the parties. Had appellees failed or refused to accede to any of the de-

mands of appellant as to the provisions of the lease which he deemed necessary, appellant could not have compelled appellee to accept the lease. If appellee was not bound, clearly appellant could not be. Appellee may have been able financially to comply fully with the requirements of the provisions of the proposed lease, but appellant was not satisfied that it was; and, as the property belonged to appellant, he could not be required to part with it until terms and stipulations satisfactory to him had been agreed upon and complied with.

From a careful consideration of the record we are satisfied that the minds of the parties did not meet, and no contract was really made. But if we were mistaken in this, and a contract was made for the lease of the property, it was a verbal trade, commenced in the latter part of July or early in August and not completed until August 31st or September 1st, and, being verbal, can not be enforced. In either view of the case the judgment of the lower court must be reversed, and it is so ordered, with directions that the petition be dismissed.