## Vidt et al. v. Burgess.

Feb. 9, 1940.

S. S. Willis, E. E. Corn, C. H. Bruce and L. D. Bruce for appellants.

John F. Coldiron and R. H. Riggs for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On April 22, 1936, Dr. Vidt and wife executed a deed to appellee, who was plaintiff below, conveying a certain lot in a subdivision of Russell, for $1 and other good and valuable considerations. In a petition filed two days thereafter she alleges the execution and delivery of a deed (to lot No. 59) and the payment of $500, the agreed sales price. She then alleges that later on the same day, and after delivery of the deed and after payment of the consideration, appellant, Dr. Vidt, came to her home and "seeing the deed" forcibly and over her protest took possession of it, and "threw the $500 in her lap," and had refused to meet her request to return the deed. She, of course, was unable under the circumstances to have her deed recorded. She asked the court to adjudge her to be the owner of the property she says was conveyed, and offers to pay into court for benefit of vendors, the $500.

As evidenced by responsive pleading, appellants denied the allegations of Mrs. Burgess' petition, and say that she came to Dr. Vidt and described a lot not mentioned in her petition and expressed a desire to purchase at the agreed price of $500; Dr. Vidt thereupon caused a deed to be prepared, and which he and his wife

executed "for the real estate described to him by plaintiff," and which he agreed and intended to sell her, being lot No. 102, as shown upon the plat and described in said deed. The deed dated April 22, 1936, was delivered on April 23, 1936, and Mrs. Burgess paid the $500.

Appellants' contention is that on the day of delivery, and within a short time thereafter, it was discovered by the parties to the deed that each had been considering and talking about different lots, and that their minds had never met in agreement upon the property which plaintiff pretended to have bought from defendants. Upon such discovery it was agreed between the parties that the deal be called off; appellee voluntarily returned the deed to appellant, and he returned the $500, thus the entire transaction was agreeably concluded, and appellee has ever since retained the purchase money he returned to her. Appellants claimed that the property described in plaintiff's petition was of a value of more than $1,600, which is undenied, and that it would be inequitable to require its conveyance for the sum of $500.

The contention of defendants was controverted by a reply which apparently closed the issues. There was some proof taken, and upon submission the court adjudged that Mrs. Burgess was entitled to the relief sought and adjudged that she was, by virtue of the deed delivered to her on April 23, the owner of and vested with the fee-simple title to lot 59 in the subdivision, as described in the petition and shown on the recorded plat; that is, a lot fronting 40 feet on Central Avenue, and extending in parallel lines back to a roadway, "being the lot which on April 23, was in the use and occupancy of Harry Hines." Appellee was awarded a writ of possession, and defendants were ordered to execute a deed to plaintiff; upon failure same was to be executed by the commissioner on behalf of defendants.

This order was made contingent upon appellee's depositing $500 in court for the use and benefit of defendants, upon their compliance. In order to obtain a clearer idea of the transaction, which is not made so by the pleadings, we shall briefly detail the evidence as relied upon by each of the parties to substantiate their respective claims. It is apparent that there was a misunderstanding.

In her direct examination by deposition, she said that on April 23, she bought house and lot (No. 59) in the Vidt subdivision, it being the lot shown on the recorded plat we have described above, and then occupied by Harry Hines. The transaction took place in Ironton, Ohio, where Dr. Vidt lived, and had his office. The deed was delivered the next day. Dr. Vidt came to her home in West Russell; delivered a deed conveying this house to her; she paid him the agreed price of $500. After delivery of the deed appellee asked Dr. Vidt if he would put the people out of the house. He said he would get them out in twenty-four hours. The two got in appellant's car and drove to the property for the purpose of "telling his tenant to get out, and while still in his car he took the deed from my hand and threw the $500 in my lap. He told me to get out, and he drove away."

Later in the afternoon appellee went to appellant's office in Ironton, and asked the doctor for the deed, and he told her he had misplaced it. One of her witnesses testified with her on this point. She says at all times appellant has refused to return the deed, she offering to return the $500, but he refused. This notwithstanding she instituted suit on the day following the taking of the deed.

Mr. Longshore said he was with Mrs. Burgess on the occasion of the visit to appellant's office in Ironton, and heard her tell the doctor she wanted to buy the property in West Russell, "that Harry Hines lived in." The doctor first asked $900, but finally agreed to take $500; she accepted and was told she could get possession in twenty-four hours; that he would bring her the deed the next morning.

Dr. Vidt testified that Mrs. Burgess came to his office inquiring about certain property; she described the property, and "I described it to her, so we would know which one each of us meant. It was my impression she described a piece of property on Canada Hollow, on the back road, a one and half story house on the left of the road going up the hollow, near the bridge. I priced it to her at $900, and she offered $500 cash; we agreed, and I told her I would have the deed in a few days." Witness says that during the conversation the name of Harry Hines was not mentioned; there was no mention of a

"hedge around the place," which language she later included in her testimony.

Witness says about two days later he took the deed over to Mrs. Burgess' restaurant and delivered it to her, and she gave him the $500. At that time witness says he and Mrs. Burgess got in his car to look at another piece of property which she had bought and was repairing; that as they drove up the hollow, and came near the house occupied by Hines, Mrs. Burgess remarked that the house needed some repairs. It occurred to the doctor then that he and Mrs. Burgess were not talking or thinking of the same piece of property, he having no desire to sell, or having sold, the Hines' property. He then informed her that the one then referred to was not the property he had sold her. She said, "Oh, yes, that's the one I mean." The doctor said, "The deed I made is for the one down below here on the road." She said, "No, I don't want that, I want this one." He said, "that's all wrong," and Mrs. Burgess then said, "The deals all off then."

They then went down to Mrs. Burgess' property, and as they came back she said, "You'd better change your mind about that," and the doctor advised her he could not do it. "We stopped in front of her restaurant and I took the $500 out of my pocket that she had given me; she took it and gave me the deed." He then says there was no taking of the deed by force, but the whole matter was carried out in a satisfactory way.

Later Mrs. Burgess came to the doctor's office and asked to see the deed. He had misplaced it for the time being, but showed her a deed from his vendor, and said: "Now the deed reads exactly like this." The doctor denies emphatically, that the name of "Hines" or a "hedge around the place" was mentioned at any time during the transaction. He did not know the people who were living in the house on lot 102; "they were squatters, and I could get them out easily," but that Mr. Hines, on No. 59, was a bona fide tenant, and had been such for some time.

He filed the deed which shows it had been executed on April 22, 1936, and conveyed lot No. 102, "as shown on the map, a copy of which is filed in the Clerk's office," and which he says was the one de-

livered to Mrs. Burgess a few days after its execution, and was the same returned to him by Mrs. Burgess. Upon examination the doctor said he was ready and willing to hand Mrs. Burgess the deed upon payment of the $500. He also says Mrs. Burgess did not read the deed when it was delivered to her, but looked at the "head lines" and put it in her purse.

On cross-examination the doctor said that the Hines' house was a two-story house, on the right side of the road, going up Canada Hollow: "It had a hedge fence around it, and a garage in the rear." Witness testified that this particular property was worth more than $1,600. He also described the lot he understood appellee was purchasing, as a one-story bungalow, with no hedge around it, and located about four blocks from the Hines' property, and known as the "Simpson" house.

Appellee, after testimony was given by appellant, came back for cross-examination and re-direct examination. On this it became apparent that such of her testimony as given on direct, and each answer therein, were fairly well prepared. However, in most respects she stood by her guns, and insisted that the doctor had sold her the property "where Harry Hines lived, at the foot of the hill with a hedge around it," the "hedge" apparently being developed by the doctor's testimony.

Witness said she opened the deed and read down far enough to see that it called for lot No. 59. She said, "As far as seeing who signed it I don't know." On direct-examination she had said that it was signed by "Charles E. Vidt and Bernice Vidt," and they had acknowledged the deed before the notary public as shown by a notary's certificate on the deed. "I don't recall the name of the notary. It was a notary in Ironton." She also says that the deed conveyed "the fee simple title and general warranty," though one cross-examination she said she did not know what these terms meant. Attention might be directed to other discrepancies, but it would avail little.

It is contended by appellant that Section 470, Kentucky Statutes, commonly called the statute of frauds, and particularly subsection 6, applies, and bars any action. It is noted that the draftsman of the petition undertook to, and did perhaps evade the

application of subsection 6 of the statute, since it is alleged that the verbal contract to convey some real estate was carried out by delivery of a deed, and payment of the purchase price. We are cited to no case which would uphold appellant's contention in this respect. However, we can agree with counsel when he argues that there was a misunderstanding between the parties as to which lot was sought to be purchased by appellee, and the one which appellant thought she was purchasing, which former as we view it, he conveyed to her.

"If A makes an offer to B concerning a given subject matter X, and B understands that A is making an offer concerning Y, and accepts the offer concerning Y, no contract exists. So, a mistake as to the tract of land agreed upon, or as to the location of a boundary line prevents any contract from existing."

The above is quoted from Page on Contracts, Section 74, in the case of McGowan v. Shearer, 176 Ky. 312, 195 S. W. 485, in which we cited Louisville Ray Co. v. Kellner-Dehler Realty Co., 148 Ky. 765, 147 S. W. 424; McKnight v. Broadway Investment Co., 147 Ky. 535, 145 S. W. 377. We laid down the academic rule that "there can be no enforcement of a contract when the minds of the parties failed to meet upon any essential element, particularly upon the subject matter."

As we view the proof it is not at all difficult to conceive the notion that here the parties had in mind and under discussion, two distinct lots in the subdivision. Appellee more than once reiterated the statement that when Dr. Vidt took the deed from her and threw the $500 in her lap, she used every effort to "tear the deed up," and the doctor used considerable force in attempting to rescue it.

The deed, which the doctor insists was the one conveying the lot described by Mrs. Burgess to him, and which clearly names "Lot No. 102," in the subdivision, was in the record when appellee was called the second time to testify. We have examined this deed, and find that it shows no signs of having been the subject of a manual struggle. The deed is in due form, and was attested as having been acknowledge before a notary in Ironton, Ohio. There are no signs of any attempts to erase any portion and insert a different number of lot.

The theory seems to be (from the pleadings and proof alone, since we have not been furnished with brief for appellee, even after three notices) that the doctor had first inserted "59," and upon discovering the mistake, had changed that number to "102," or had written another deed, although appellee insists that she held on to the deed until the doctor forcibly took it from her hands. It is just as possible, that if the original carried the number "59," and appellee discovered a mistake, she intended to hold the vendor to trade which she knew he had not made. But if it did carry this lot number, why was she so insistent on tearing it up? Another part of her proof shows that she took some witnesses with her a few hours after the occurrence, to the doctor's home, not to look at the deed, but to "call for her deed."

We are at a loss to understand some motions, orders and rulings, that were made after judgment was entered, and in which it is shown that appellee deposited with the clerk $500, to be paid to appellant upon complying with court's order to make deed in accordance with the decree. It seems that in some way the appellant got hold of the fund. Whether he attempted to comply with the decree, we cannot determine. It appears in one motion for a rule made after judgment, appellant was called upon to "show cause why the judgment entered should not be amended so as to correct the description of the property described therein." This, notwithstanding the fact that a comparison of the description in the judgment tallies with that in appellee's petition, and certainly with the description given in her ex parte testimony. The question naturally arises whether or not appellee had changed her mind as to what particular lot she was endeavoring to purchase.

Be that as it may, we must take the record as presented; doing so, and giving the proof careful consideration, we are of the opinion that the minds of the parties did not meet sufficiently to give the appellee the right to force appellant to execute and deliver to her a deed to lot No. 59, or the house where Harry Hines lived, "with a hedge around it."

Judgment reversed, with directions to set same aside and enter one dismissing appellee's petition.