## Chevrolet Motor Co. v. Pieper's Trustee.

June 16, 1939.

As Corrected on Denial of Rehearing Nov. 17, 1939.

Jouett & Metcalf and J. A. Logan for appellant.

M. C. Redwine and James Park for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appeal from a judgment in favor of appellee, plaintiff below, against appellant, defendant below, entered on a jury's verdict awarding $2,650 for alleged breach of contract.

George Pieper theretofore engaged in the automobile business, trading under the name of "Pieper's Garage," was authorized dealer in Chevrolet motor cars, parts, equipment, etc., under a written contract with appellant, dated August 1, 1930. It is his claim that on May 19, 1931, appellant and one Cutter agreed, in parol, with Pieper to repurchase from him all appliances, tools, equipment, parts, etc., pertaining to his agency, and to pay therefor full value based on actual cost, the consideration being his immediate relinquishment of the 1930 contract.

He alleges that pursuant to the agreement he gave up his contract, and on May 26 Cutter, for himself and Chevrolet, accepted his resignation. Thereafter appellant and Cutter refused to pay for the merchandise on hand and because of such failure he was damaged to the extent of $6.500. He asserted that minus the agency the merchandise, particularly fitted to the repair and upkeep of Chevrolet cars, was of no value to him.

Subsequently appellee was adjudged bankrupt; O. H. Hamilton who was appointed trustee filed an inter-

vening petition, asking to be and he was allowed to prosecute the cause. In an amended petition he somewhat clarified the original pleading, but did not alter the cause of action, except to reduce the damages to $6,250, which was later reduced to $5,915. Then followed removal of the cause of the federal court, but it was remanded to the circuit court on petitioners' motion.

We gather from the briefs (only) that upon trial in the federal court appellee's proof was such as to reduce the recoverable amount (and a recovery was had) below the jurisdictional amount necessary to maintain suit in the federal court.

Defendant in answer denied the allegations of the petition and affirmatively plead: (1) That its written contract governed all transactions between the parties, with the right of either party to cancel the contract upon written notice; that on May 28, 1931, it terminated the agreement, effective on August 1, 1931. It also plead other meritorious defensive matter, the chief plea being that the salesman who agreed to repurchase was without authority to make such an agreement so as to bind Chevrolet. It is argued that this was a belated plea; nevertheless it is here, and we must observe it.

Cutter filed separate answer in which he followed, substantially the Chevrolet answer. Hamilton by reply alleged that "one of the moving considerations for the sale by Pieper to defendants, was that Pieper would resign so that Chevrolet could appoint another to sell its products in Winchester; that after Chevrolet had agreed to purchase, Pieper did prepare and deliver his resignation, but the sale contract preceded the delivery of his resignation." He says that the resignation was recalled only after defendant refused to carry out its contract of purchase; that the letter of Chevrolet (May 28) cancelling the contract, was given after the purchase and sale of merchandise. He denied all other material allegations of the answer and plead that prior to the time when he delivered his resignation, the terms of sale had been agreed upon; manner of payment suggested, and a survey of stock made, all looking to the carrying out of the sale and purchase; that the contract was breached without cause, or any fault on his part, but on account of some objection by the newly appointed dealer.

After denying alleged liens and executions, Hamilton alleged that the price agreed on was in excess of the

amount of valid mortgage liens on the property. The affirmative allegations of replies were controverted by agreement of parties. Following a motion to require plaintiff to specify what agent acting for the Chevrolet company had contracted in the purchase of merchandise, he said that it was by Cutter and Stanfill, acting with authority. Thereupon appellant amended its answer, specifically denying the authority of either to thus contract for it. The issues were formed and upon submission a jury returned a verdict against Chevrolet in the sum of $2,650, upon which verdict the court rendered judgment; motion for a new trial was overruled and appeal granted.

In appellant's brief it is strenuously argued that: (1) There was no evidence to sustain the allegations of the petition. (2) That peremptory instruction to find for defendant should have been given, as requested either at the close of defendant's evidence, certainly after all evidence was in. (3) Error of the court in refusing instruction on three phases of the case, justified by the pleadings and the evidence, namely: (a) Pieper's failure or refusal to comply with the Bulk Sales Law; (b) Swope was a known prospective purchaser, and (c) on Pieper's withdrawal and its effect. We find it necessary to discuss only grounds 1 and 2.

Appellant argues that Stanfill was without authority, express or implied, to bind Chevrolet in the purchase of Pieper's merchandise, and that since the burden of showing such authority was upon appellee, he failed to bring forward sufficient evidence to sustain the finding by the jury, or to authorize the court to submit on this question.

Appellee contends that "the finding that Stanfill purchased Pieper's parts for the Chevrolet Motor Company, is amply supported by the evidence." It may be gathered from the evidence, save that of Pieper's and his is not at all clear, that Pieper knew that Stanfill in undertaking the repurchase, was in behalf of Swope, who had, on May 11, taken over the Chevrolet agency. But admitting for the sake of argument that Stanfill was not acting for Swope, the question remains whether or not he was authorized to purchase for Chevrolet, and appellee argues that:

"The finding that the contract made between Pieper and the Chevrolet Motor Company was with-

in the actual or apparent scope of Stanfill's authority, is amply supported by the evidence."

In support of appellee's contention he points to the fact that in selecting Pieper as Chevrolet agent, Stanfill was at the garage every day for a week or more until the deal was completed. Later he called on Pieper regularly, or at intervals, to sell him parts; that Stanfill held himself out as the Chevrolet representative, or "field representative;" that Cutter testified that Stanfill "called on dealers that we already had in the territory. * * * The principal part of the work was to sell cars. He would also follow up instructions I would give him. If we had a town where we didn't have a dealer he would call on all the available prospects, or he would call on the dealers that were handling other cars, and try to interest them in our car, and then if he was able to interest them he would send their contracts to me for my approval."

Cutter and Stanfill met Pieper in Lexington about the first week in May. Pieper was lax in his payments, and not producing business. He had promised Cutter to raise more money. At the Lexington meeting Pieper admitted his inability to raise funds, and Cutter said to Stanfill that he should proceed at once to find another dealer in Winchester, and this Stanfill did, interesting Swope, who later (May 11) signed a contract sent to Cutter for approval. Cutter at one time was asked if he sent Stanfill any special instructions, and he replied:

"No, just in the regular course of his duties he would handle anything that come up. If we had open point of the size, say at Winchester, he would call here, he sure would concentrate here, and stay after it to clean it up."

Stanfill said in the course of that job (referring to cancellation of Pieper's contract) one of his duties was to call on Pieper with reference to this resignation; to terminate his agency. Stanfill admitted that it was the purpose to get a new agent and terminate Pieper's contract.

It is argued that on the Lexington trial there was neither issue nor proof as to the extent of Stanfill's agency. This issue is raised here, and proof was introduced which showed, not lack of authority to negotiate a cancellation of the contract, but lack of power to

exercise Chevrolet's option to purchase from Pieper, on terms and conditions of which, so far as the proof shows, Chevrolet was not apprised nor of which it had knowledge, unless Stanfill's knowledge was that of Chevrolet's.

On May 11, 1931, Swope Motor Company wrote a letter to Chevrolet (Cutter) saying:

"We agree to purchase from Pieper's Garage, or the Chevrolet Motor Company, approximately * * * (parts to amount of $3500). We understand that Pieper is not in a position to turn these items at once, and should we be unable to make a deal for same, will purchase within thirty days."

It is argued, though not material to the question, that this letter shows that Stanfill was dealing for Chevrolet. The contrary appears to us to be the case. On the same day Stanfill wrote to Cutter: "You will notice that a deal could not be made with Pieper today for certain lot or equipment that he has." Cutter did not reply to this letter. It is argued that this is proof that Stanfill was acting for Chevrolet. When we construe the Swope and Stanfill letters, it is apparent that Stanfill was acting for Swope. In a letter of May 27 from Pieper to Cutter he refers to a meeting between himself and Stanfill, when other persons (creditors of Pieper or representatives) were present, when Pieper said:

"Mr. Stanfill agreed that if I would give up my contract with you that the company would exercise its option and take over my parts, tools and equipment in the shop, and that he would have Mr. Swope pay me for same."

This, of course, was after the alleged sale or repurchase.

It is argued that this served notice on Cutter that Stanfill had been undertaking to make a Chevrolet deal for Pieper's merchandise, since it was shown that Pieper had telegraphed Cutter on May 22 that his resignation was withdrawn because, "you did not purchase parts tools and equipment as agreed."

It must be noted at this point that nowhere in the record is it shown that Chevrolet, through Cutter its zone manager, or otherwise, knew of any such proposed agreement, or authorized the purchase on its behalf, or did anything to mislead or deceive Pieper, with respect

to obtaining his resignation. The proof lends strength to the idea that Pieper during all the transactions involved, knew that insofar as any purchase was concerned, Stanfill was acting for Swope. It may be added that as soon as Pieper's attitude was made known to Cutter, the zone manager at once cancelled the contract; said nothing about exercising its option and followed with a letter denying any part in or knowledge of the transaction.

Something is said of the fact that when Pieper, Stanfill and several of Pieper's creditors, and persons representing creditors, met in front of the courthouse, the purpose being to ascertain whether or not the lien-holders, and the officer who held the execution, would be satisfied if payment be made in a manner discussed and noted by Stanfill, the latter used the word "we" in assuring the creditors that agreement had been reached. There is little significance in this. Whether or not Pieper knew or believed that Swope was to give the check, in whole or in part, to pay the creditors, the majority of the others were present and understood that Swope was the purchaser.

As we further read the evidence we are convinced that Pieper knew, or should have known, the extent of Stanfill's authority. It is true that Stanfill dictated Pieper's resignation. When Pieper read and signed it he saw that it was addressed to Cutter, Zone Manager of Chevrolet. He saw that it contained no reference to the exercise of Chevrolet's right of option nor to the alleged deal with Stanfill. Ordinary prudence on his part would have suggested some mention to Cutter of the most important part of the transaction. Appellee only indirectly and vaguely undertakes to make it appear that Stanfill was buying for the company.

The only authority which Stanfill had was to go to Winchester and "find another dealer." This order was given by his superior officer at the Lexington meeting when Pieper was present. Mr. Hamilton testifying for plaintiff, said that Stanfill would call every week, and "get orders for cars, parts and accessories." Pieper says the same, as do Stanfill and Cutter. Cutter was permitted to say and did say, that he never agreed to purchase Pieper's merchandise, or authorize Stanfill to purchase for Chevrolet from Pieper.

It is not necessary for us to go into close analysis

of the evidence and circumstances detailed bearing on this question. The great weight of the proof shows that Stanfill was nothing more than a salesman. True he made arrangements for establishment of agencies, but it is noted that no act of his in this respect was binding until approved. We find nothing to indicate that the exercise of the repurchase option, or the proposed purchase of merchandise by Stanfill was authorized by his employment by Chevrolet; nor were such transactions within the apparent scope of Stanfill's authority. Neither Cutter nor Stanfill, nor anyone else mislead or attempted to mislead Pieper as to the extent or apparent scope of Stanfill's authority. As said in appellant's brief: "He was authorized to sell, but not to buy."

Counsel for appellee in support of his contention cites cases from this and other jurisdictions, not only laying down the measuring rule, but tending to show by comparison that Stanfill's actions were authorized, or within apparent scope.

The cases are: (a) Crump v. Sabath, 261 Ky. 652, 88 S. W. (2d) 665; (b) Louisville Cement Company v. Coleman & Sons, 222 Ky. 183, 300 S. W. 633; (c) Herfurth v. Horine, 266 Ky. 19, 98 S. W. (2d) 21; (d) Nelson v. Black Diamond Mining Company, 167 Ky. 676, 181 S. W. 341.

Case (a) was one involving the training and racing of a horse belonging to appellee. We found that "there was a sharp conflict and uncertainty concerning the agreement as to the division of the horse's winnings." There were other features and circumstances entering into our conclusion that the court erred in directing a verdict for appellee. One of importance was that of ratification. The case here does not measure up to the Crump case, because of the failure of proof on the part of appellee to show ratification by appellant of Stanfill's alleged purchase, but because it fails to show apparent authority.

In case (b) it was shown that Beard, salesman for appellant, had exercised broader authority than that of salesman, "on a number of occasions," and contracts made by him had been ratified by his principal. "The custom established by appellee's proof, and admitted to some extent by appellant, tended to establish that Beard had the authority to make the contract, which was not one of purchase, but involved a sale of cement," and a

split of profits. In the instant case it was not shown that it was customary for. Stanfill to purchase or exercise an option to purchase on behalf of appellant.

Case (c) involved the question of authority for an attorney to bind his client. The attorney had employed appellee to testify as an expert witness in a will case, and appellants contested a sizable allowed fee on the ground that counsel had no authority to employ the expert. The proof showed that the attorney had authority "to furnish necessary witnesses." The only question there, was as to who should pay. We found that the attorney was acting within the scope of his authority in the employment, his office being more exacting than the ordinary agent.

Case (d) was a personal injury case. Franklin, an officer, was sued along with the mining company. In affirming the judgment below, finding for both appellees, we held that Franklin had no authority to "hire or fire," hence he was not liable.

Counsel for appellee refer to Standard Sanitary Mfg. Company v. Stump, 212 Ky. 253, 278 S. W. 583, and Peaslee-Gaulbert Company v. Rogers, 220 Ky. 338, 295 S. W. 137, 55 A. L. R. 377, relied upon by appellant, and insist that neither is applicable to the instant case, when the proof is considered. We are inclined to the opinion that they are applicable, and of persuasive influence. In the first case the principal's salesman had gone beyond his actual or implied authority by entering into a contract with purchaser of supplies, that he would join with a local plumber to install the supplies. In passing we said [212 Ky. 253, 278 S. W. 585]:

"It is clear, therefore, that, even if appellee's version of what took place be correct, the salesman of appellant was without authority to make any contract, and especially so extraordinary a one as embarking his principal, engaged solely in the business of selling plumbing material and fixtures in a joint enterprise with a third party, which not only embraced the furnishing of the required material, but also its installation. Cf. Lucile Mining Company v. Fairbanks, Morse & Company, 87 S. W. 1121, 27 Ky. Law Rep. 1100; Second National Bank of Richmond, Indiana, v. Adams, 93 S. W. 671, 29 Ky. Law Rep. 566, and J. M. Case Manufacturing Company v. Vickers, 147 Ky. 396, 144 S. W. 76. As was well

said in the Second National Bank of Richmond, Ind. Case, supra, where the act of the agent is not within his implied power, those who deal with such agent are bound at their peril to know the extent of his authority. So appellees in this case were bound at their peril to know the extent of the authority of appellant's salesman, and since he had no authority, express or implied, to make the contract appellees say he made, they have no claim under it against appellant.''

We quoted with approval the Standard Sanitary Manufacturing case in Peaslee-Gaulbert Co. v. Rogers, supra. This case is so clearly in line with the one here that we shall quote from it to some extent:

"It is contended for the Peaslee-Gaulbert Company that the drummer that made this sale made no such contract as Rogers contends, and, moreover, had no authority so to do. The evidence is conflicting. Rogers contends such a contract was made, and the drummer who sold the goods said this, when asked about what he told Mr. Rogers about the right to return any of the goods:

'' 'The only agreement I made was in the event he should have in the various lines that he bought from me any dead items that were not moving, that we would, under condition that they were in salable condition to sell, in their original boxes and all, exchange these particular items for other items of their own line.'

"The contention of the Peaslee-Gaulbert Company is that the jury should have been instructed to return a verdict for it for the amount claimed. It is agreed that the amount is correct. It is obvious the only question of importance which the court is called upon to consider is whether or not a drummer, without express authority so to do, or custom of trade in that behalf, could, on a sale of goods to a customer, obligate his principal by an agreement that any portion or all of the goods might be returned for credit at the price at which they were sold. This was an extraordinary or unusual contract, and the evidence does not disclose any support or sanction of it by any usage or custom of business. In order to prevail, it would be necessary for Rogers to show such a contract was made, and

that the drummer had express authority to make it, or that the Peaslee-Gaulbert Company knew of it, and either did, or omitted to do, something which would amount to a ratification of it. Rogers failed to show either. He failed to show any knowledge on the part of the Peaslee-Gaulbert Company of the contract which he claims was made, and thus the Peaslee-Gaulbert Company would not be bound by the contract, unless it was made by the agent within the apparent scope of his authority. Those dealing with a drummer have the right to presume that the drummer is authorized to sell the goods in the usual manner only, and may only sell upon such terms as are reasonable or comport with the usage and custom of the trade in like undertakings and it is to this extent, and this extent only, that a drummer may be said, as a matter of law, to be acting within the scope of his apparent authority. See Storey on Agency, (2d Ed.) Section 60; Tiffany on Agency, Sections 45-47; Benjamin on Sales (6th Ed.) Section 624; Wharton on Agency, Section 189. * * *

"In this case Rogers was bound at his peril to know the extent of the authority of the drummer who sold him these goods. A person dealing with a drummer is required to act with ordinary prudence and reasonable diligence. If the drummer assumes to exercise, in and about the making of the sale, authority of an unusual, improbable, and extraordinary character, such as would be sufficient to place a reasonably prudent person upon his guard in dealing with him, the party so dealt with will not be justified in disregarding what his common sense must tell him, and be permitted thereafter to seek to hold the principal to the contract so made, upon the theory that it was made within the scope of the agent's apparent authority. The facts of this case were not calculated to induce Rogers to believe that this contract was within the scope of the agent's apparent authority."

In the case at bar the testimony shows that Stanfill was a salesman. The fact that he solicited agents or agencies, same to be appointed or established only with the approval of his superior, did not extend his authority to exercise an option of repurchase.

That the burden of establishing agency is on the one

asserting its existence, and for a discussion of the other principles in this case, see Kentucky-Pennsylvania Oil & Gas Corporation v. Clark, 247 Ky. 438, 57 S. W. (2d) 65. General Service Garage v. Lexington Oil Company, 274 Ky. 330, 118 S. W. (2d) 690; Consolidated Grocery Company's Trustee v. Hadad, 245 Ky. 549, 53 S. W. (2d) 951; Seaboard Oil Company v. Huntsman, 196 Ky. 758, 245 S. W. 860.

After a review of the evidence and applying the rules and reasoning laid down in the cases applicable, supra, we are convinced that the appellee failed to show that Stanfill was acting within the scope of his authority, actual or apparent, in the alleged deal with Pieper, therefore the court should have sustained the motion for peremptory.

Judgment reversed for proceedings consistent herewith.