# Roberts et al. v. Babb et al. (two cases).

March 1, 1940.

C. H. Wilson, Judge.

Wheeler & Shelbourne and A. C. Moore for appellants.
C. C. Grassham for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming in part and reversing in part.

C. R. Babb on May 7, 1935, owned a tract of land in
Livingston County, and on the day named he and his
wife executed a mineral lease to appellants Roberts and
Frazier, who afterwards took in other parties as part-
ners. The lease was to run for a period of twenty years,
"or as long thereafter as ore is found and mined in
paying quantities." Lessees were granted the right of
entering, prospecting for, developing and mining fluor-
spar and other minerals on the following terms:

(1) Lessees agree to pay fifty dollars per month
on or before the fifth day of each month for the preced-
ing month.

(2) Agree to pay monthly a royalty of one dollar per
ton per month for each ton mined and shipped during
the preceding month, for all fluorspar and other min-
erals.

Lessees were given the right to ingress and egress,
necessary to carry on flourspar mining and milling op-
erations, and surface right upon 200 feet on each side
of the veins "whenever agreed to" by the parties, and
the right to remove equipment, "provided all royalties
are paid in full." The two sections, (1) and (2), to-
gether with the following, enter into the controversy:

(5) Lessors bind themselves, at any time during
the lease period, upon election by lessees, to convey the
mineral rights for ten thousand dollars, cash or its
equivalent.

(6) The violation of any of the provisions of the
lease agreement shall render the entire contract null and
void.

(7) The contract was to be binding upon the heirs,
assigns and successors of the original lessors.

Upon execution of the lease lessees began prospect-
ing, later developing; erecting mining equipment and
buildings of appreciable value. They later assigned an
interest to other parties, who came into the litigation
as intervenors, in the after mentioned consolidated
cases.

The record discloses that both Mr. and Mrs. Babb

died after the lease was made, leaving six children who inherited the leased property, including the lease rights in question, and in whose names the suits were prosecuted. We shall incorporate as a statement of the case, in addition to what we have stated, excerpts from the written opinion of the court, taking the liberty, however, of interpolating at various points our own recitations of pertinent matters gleaned from a review of the record.

It is evident from the court's opinion, and a survey of the record, that the sharp controversy presented, started about December 28, 1938, when lessees notified lessors in writing that they elected to exercise their option to purchase the leased mineral rights, under the provisions of clause (5). Following this notice, and on January 2, 1939, lessors served written notice on lessees, assuring them that they had failed to comply with the conditions in respect of the payments of rentals and royalties. There were other and divers communications between the parties by their respective counsel, which, as we view them, evidenced a likelihood that the contenders might get together on an amicable settlement of the pending disagreements.

These notices are set out in full in the petition filed in one case, and perhaps in both. It may be sufficient to say, as the chancellor said, that the correspondence (by notice) finally culminated in a refusal of lessors to convey. The heirs offered to make a deed on condition that lessees would pay rents and royalties due. The lessees advised that all future rentals and royalties paid under the lease contract would be claimed by them, as a payment pro tanto on the $10,000, payable on delivery of a general warranty, and free from incumbrances, deed. Lessors met this proposal with a notice that the failure and refusal of lessees to pay certain rents and royalties (on stored spar) in the manner agreed, had violated the lease contract, especially clauses 1 and 2, and declared the lease null and void.

The first styled suit asked for a declaration of rights of the parties; the second suit, based on the failure of lessees to comply with the contract, and allegations of insolvency and the suffering of irreparable damages, formed the basis of the suit seeking injunctive relief against lessees. After voluminous pleadings, demur-

rers, and motions to strike had been passed on by the court, the cases were consolidated. It was stated in the opinion that the only question to be determined was the relative rights of the parties, within the intendment of the lease contract, "and in so doing we must look to the evidence to learn whether or not the terms of the lease contract have been met. But before looking to the evidence, a brief analysis of the contract is essential." The court says:

"Evidently the contract contemplated that lessees should 'prospect, develop and remove from the mines fluorspar,'" and after reciting paragraph 2, the court asks: "Does paragraph 2 mean that the mining and shipping must be continuous and active, carried on each month in good faith, mining, shipping and selling spar, or does it mean that spar from the leased premises may (when mined) be placed in bins underground or on the surface? If the business was not to be prosecuted in good faith and the activities carried on continuously in the manner set out, and the products sold at least once a month, why the language 'for each ton mined and shipped during the preceding month?'"

The Court then sets out the option of purchase, clauses 5 and 6, the annulling clauses, and says:

"The lessees seek to avoid the terms of the contract for payment of rent ($50.00 per month) on the grounds that they had an agreement with the administrator, on behalf of the heirs to pay $2.00 per ton royalty, in lieu of the $50.00 per month rental, for the four months in question."

This, says the court, was denied in evidence (and in pleading) by the administrator, who testified that there was an agreement, but it was to forego the monthly rental, upon payment of the $2 royalty, until the spar production proved profitable, and they would then make payments as provided in the contract. The spar production, as witness said, became profitable about February 1, 1937. This testimony was corroborated by another witness.

The court concluded from the proof that lessors' contention on this point, and others, was the correct one, and found that the lessors were entitled to recover

of lessees at the rate of one dollar per ton for all spar displaced or shot down in the mines at the time of the alleged offer and tender of the purchase price fixed in the contract. The chancellor found that the delayed rentals amounted to $200, and unpaid royalties were $3,000, or a total of $3,200, prior to December 28, when the offer and tender were made.

The court further found that under the lease agreement monthly shipment of spar was contemplated; that the displacing of the ore and its consignment to bins, or removing it to the surface, constituted "mining," and the contract meant to provide the shipping of the ore as mined, or at least in monthly intervals. The court found that there was a ready and continuous market for spar, and that lessees had continuously sold its products without suspension or rejection.

It was claimed that such spar as was on the surface was "dump piles or waste." It was found that these dumps ordinarily carried 20% of marketable ore, and the court found that there were 2,000 tons which did not constitute "dump or waste," but marketable product.

It was also claimed in proof that all displaced spar in bins was left to protect the mines and miners, but expert evidence, the chancellor found, shows that such placement was unnecessary for the purpose. The court did not overlook the fact that his estimates were based on the bin calculation, but he ventured the safe assertion that in all there were approximately 3,000 tons of marketable spar on hand, which lessees could and should have shipped under their contract, but failed to do so, knowing that they contemplated the exercise of their option.

It appears in the record testimony that while prospecting and small operations were going on, and the project did not look too inviting, one of the lessees approached the administrator and told him of their losing money and their intention to give up. It was suggested to Babb that if he would waive the $50 per month rental, and fix the royalty at $2 per ton for all spar mined and shipped, they would continue to sink the winze in the hope of finding pay dirt. The administrator admitted the conversation, and an agreement, but says the agreement was that the waiver of rental would only last until

such time as spar was mined in paying quantities, which was about February 1937. . He further said that he had demanded the royalty only for four months, beginning October 1937, but had received no rental. Another witness, one of the heirs, went further, and states that the waiver was to continue till spar was produced in paying quantities, and when found the four months' rent would be refunded. There is room here for an honest difference.

The court then expressed the opinion that the plaintiffs (appellees) were under the contract entitled to recover from lessors $200 for four months' rent, and $1.00 per ton for all spar displaced or shot down at the mines at the time of notice (Dec. 28, 1938) and for this conclusion gave plausible reasons.

The court then takes up the forfeiture clause (6) and expressed the opinion that the lessees were willfully delinquent in the payment of rents and royalties, and hence had no right to exercise their purchase option, "not having come into court with clean hands, their duty to pay precedes the right to claim the deed." The court further said that operation of the mine and removal of spar, after the declared forfeiture, is a continuing violation of the contract; that the evidence shows the insolvency, and inability of lessees to care for and protect the rights of lessors, hence the court thought permanent injunction should go, but not to interfere with lessees' right to remove the machinery and equipment. Lessees were ordered to report at once and account for and pay into the hands of the commissioner all monies collected, less expenses, attending the shipping of ore since December 28, 1938. Possession to be restored to lessors.

It may not be amiss at this point to say that on April 28, the chancellor, in the consolidated actions, entered an interlocutory order, which a judge of this court found in effect to be a mandatory injunction. By this order the lessees were required to pay into court, and to the commissioner, 50% of all monies realized from the sale of spar which was then shot down, also to pay in 25% of all monies realized from spar thereafter mined.

The lessees appeared before a judge of this court on June 21, 1938, and moved for a dissolution of the order. The whole court sat at the hearing; the motion was

sustained, and the amount required to be deposited was materially reduced. The judge said:

"Furthermore I am of the opinion that the amounts required to be paid to the commissioner were excessive. The amounts were fixed no doubt, on the theory that the defendants might be declared trespassers from the date of the notice of forfeiture, if plaintiffs claim thereto should be sustained in the final judgment. I find nothing in the record, however, warranting the conclusion that the defendants are trespassers, even though it may be later adjudged that plaintiffs are entitled to a forfeiture. On the question of forfeiture no opinion is expressed. A bona fide controversy existed between the parties as to whether the defendants should pay royalties on all fluorspar in bins or shot down, in the mines before exercising their option of purchase, and even if they are wrong in their contention, the defendants should not be penalized by being declared willful trespassers and required to pay the increased damages incident to an intentional trespass."

After this writing was filed in the court below, on September 12, 1939, the court entered judgment, substantially as stated, and further adjudged that:

(A) Defendants are required within ten days to file with the clerk a statement of all spar mined since December 28, 1938, to the effective date of this judgment. As to what plaintiffs are entitled to will be reserved for judgment.

(B) Defendants will forthwith surrender possession of the leased premises, and they are permanently enjoined from further operating. They have the right to remove machinery, equipment and buildings from the premises as provided in the lease.

(C) Injunction granted; writ of possession will be suspended on execution of bond in the sum of $50,000, same to be executed within 20 days from judgment. This sum was reduced to $7,500 by an order of this court upon appellant's motion, and bond was duly executed. Later lessees filed the required report, showing the amount of spar mined after December 28, 1938, and up to September 12, 1939, upon which showing the court on

November 28, 1939, rendered judgment for lessors for $2,936, royalties.

We shall first discuss the contention that the court erred in adjudging that lessors were entitled to recover for the quantity of spar from the ore which had been shot down and stored in bins, in the mines or deposited on the surface.

There seems to be little dispute as to the quantity, though the testimony on this point, as well as on values, is not any too enlightening, but we are inclined to the opinion that the proof is sufficient for us to agree with the chancellor's finding. The chief argument of lessee is to the effect that so much of the ore as was stored in bins was necessary for the protection of the mines and the safety of the miners, asserting that the storing prevented sloughing or sliding of soil from one level to another.

The court on conflicting proof found that this method was not necessary; not the sole method, since it was shown that the protection could have been amply afforded by the use of timber, though its use would have been more expensive. The proof adduced was sufficient to justify the court's conclusion on this point. However, as we read the record, we see little occasion for much argument about this matter, since it is shown that the process was to keep the bins full all the time; this was done by withdrawing the ore from the bottom of the bin, and replacing with newly shot ore. As said in brief, the ore was "not static," but kept moving as shipping needs required. Under these circumstances we can see no reason why the lessors should not account for such ore as was in the bins at the time of election to purchase, if no other valid reason exists. The same is true of ore stored on the surface.

It is argued that the lessees were liable only for such spar as was actually shipped, and not for such as was stored. On this point we agree with the court's ruling, that it was intended that there was to be a continuous shipping of ore as mined. The lease (clause 2) binds lessees to pay $1 per ton royalty for each ton mined and shipped during the preceding month, so it was contemplated that there would at least be a monthly shipment. The lease was for the purpose of mining ore,

and removing spar which might be found under the tract of land.

The court cannot see its way clear, upon reading the entire contract, to place such narrow construction as suggested. If we give too much emphasis to the word "shipped" we overlook the word "mined" as used throughout the contract, which evidenced that there should be developing, mining and removing ore. These must be considered when we look to the royalty payment clause, which is the only one using the word "shipped."

If we construe the clause adversely to the views expressed by the court, it would lead to the inequitable conclusion that there would be no limit to the quantity of ore that lessees might store in the bins or on the surface. Such storage might continue for any number of years, and while ultimately lessors would be paid royalties when shipping occurred, this would be unfair, since it was apparently evidenced by the contract that there should be a continuous shipping, and a monthly accounting of both rents and royalties.

It is apparent from the record that some of this stored ore had not been recently mined. The greater portion had been thus stored for a considerable length of time, and it was this fact, perhaps, that actuated the court in suggesting that the failure to ship was not in good faith, but done with an ulterior motive. This point we shall not further discuss, since from the final conclusion reached, any motive on the part of lessees will not be of importance. The case of Givens' Ex'rs v. Providence Coal Co., 60 S. W. 304, 22 Ky. Law Rep. 1217, relied upon by appellants, is of no persuasive influence in their contention.

Taking up the contention that lessors were clearly within the law in their effort to cancel the lease, as the court held, we must disagree with the court. Their contention evidenced throughout the whole matter, by the numerous letters, notices, pleadings and proof, show to our minds that the intention to cancel was an afterthought; superinduced by the notification that lessees had elected to exercise the option. The notices clearly manifest an intention or willingness on the part of lessors to waive any and all alleged defaults and derelictions on the part of the lessees. They said in substance:

We will agree to make you a deed to the property, provided you pay past due rents and royalties, which latter included such as were due on stored ore, though we will not agree that royalties on such ore as is later mined shall apply pro tanto on the purchase price.

The rent was more than twelve months overdue; for four months beginning October, 1937. At the time of the offer a great quantity of the ore was stored in the manner stated, though there is some proof that there had been some—not definite—effort to collect royalties. It was admitted by Mr. Babb that he had not sought to collect the deferred rentals, and apparently the first time it was mentioned was in the correspondence relating to the terms of sale, and then only as entering into the terms of the trade. All past delinquencies appear to us to have been merged into the proposed contract of sale, and it was not until lessees indicated that if the lessors complied, then lessees would expect to deduct from the purchase price, the royalties on mined ore. This seems to have been the "last straw."

It seems clear from all the proof that at any time had they so chosen, they could have collected for such arrearages as were claimed, though they were not compelled to resort to legal means to enforce collection. It is fairly well established by the evidence, even that adduced by the lessors, that, notwithstanding the court held otherwise, lessees were able to pay rentals, and the mined ore was on their land.

In answer to lessors' argument hereinafter discussed, as to the matter of enforcing specific performance, we might say that the general and well recognized rule in this jurisdiction is that forfeitures are not in favor. The mere fact that a lease provides for forfeiture, under terms and conditions, does not give the right to declare a forfeiture under all facts and circumstances. A forfeiture will never be decreed when upon equitable principles it works an injustice.

In speaking of this principle, and quoting from Cadillac Oil & Gas Co. v. Harrison, 196 Ky. 290, 294, 244 S. W. 669, we said, after quoting the above principle, in Warfield Natural Gas Co. v. Ward, 244 Ky. 436, 51 S. W. (2d) 256, 257:

"The doctrine of equitable estoppel is generally

applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he had acquiesced or of which he has accepted any benefit.''

Here the basis of forfeiture, set up after lessees had elected, was a failure to pay rents to the amount of $200, long since due, and to pay royalties on a quantity of spar, or ore, stored in bins or spread on the surface. There was, as we indicated in ruling on the motion to dissolve the restraining order, a bona fide controversy between the parties, as to whether lessees should pay royalty on ore shot down but not shipped. There was no controversy between parties as to payment of delayed rentals, until the proposal to purchase was made. The forfeiture clause, as we construe it, at least in part, was intended as a security for the payment of rents and royalties. Under the circumstances shown here, the failure should have been disregarded by a court of equity, unless the failure to comply strictly was shown to have been willful or intentional. Pomeroy's Equity Jurisprudence, 1, Section 455.

The court held lessees did not have the right to exercise the option of purchase, for reasons set out in the above quoted part of his opinion. We think under all the facts and circumstances, the chancellor was in error. What we have said, in respect of lessor's right to cancel the contract, is a complete answer to the contra argument, since clause (5) gave lessees the right to declare on their option at any time during the life of the lease.

The chief argument of lessors is substantially to the effect that the determination of the question, as to whether or not a specific performance should be decreed, rests in the discretion of the court. Stated broadly, as it is, this is the general rule. However, the broad rule is circumscribed by other rules, which are sound. The discretion vested in the chancellor, is always to be exercised without losing sight of the fact that its application must be regulated, guided and controlled by legal principles. Edelen v. Samuels, 126 Ky. 295, 103 S. W. 360. The discretion must be a sound judicial discretion, Miller **v. Prater, 267 Ky. 11, 100 S. W. (2d) 842, and**

always depends on equitable principles, under the circumstances of the particular case. Kentucky-Penn Oil & Gas Co. v. Clark, 247 Ky. 438, 57 S. W. (2d) 65.

Applying the equitable principles above recited, and concluding that lessors did not have the right to forfeit, it follows that under clause 5 of the lease, lessees were within their rights to exercise their option. It will be noted there is no charge of fraud or mistake; the whole controversy hinging on a construction of the terms of the lease, about which there was a bona fide controversy.

It also follows from our conclusions that it was the duty of lessors, within a reasonable time after December 28, 1938, and upon payment of the agreed price, to tender a deed to the mineral rights underlying the tract, and we so hold. Consequently the lessees should not have been required to pay to lessors any rents or royalties after such reasonable time following the notice. So much of the court's judgment decreeing otherwise and cancelling the lease, should be set aside.

So much of the judgment as decrees payment for the rentals past due, and for royalties on mined spar, was correct and is affirmed; upon remand the court will enter orders in conformity with our declaration of rights of the parties, and will dissolve the injunction.

Affirmed in part and reversed in part.