## Cole v. Big Run Coal Company.

(Decided May 4, 1923.)

## Appeal from Boyd Circuit Court.

1. Mines and Minerals—Finding Mine Superintendent was Given no Express Authority to Contract for Sale of Timber Held Sustained. —Where the testimony of a mine superintendent that he was authorized by the corporation's president to contract for the sale of the timber was denied by the president, whose denial was corroborated by the fact that the superintendent never reported any payments made on the contract by the purchaser, the court's finding that no express authority was given the superintendent to make the contract was supported by the preponderance of the evidence.

2. Mines and Minerals—Mine Superintendent Has no Implied Authority to Sell Timber Commercially.—The mine superintendent of a coal-mining corporation has not, by virtue of his employment, any implied authority to sell the timber from the corporation's real estate for commercial purposes.

3. Corporations—President has no Inherent Authority to Sell Property.—The president of a corporation is not inherently authorized to make a contract for the sale of its property.

4. Mines and Minerals—Powers Given Superintendent in Operation of Mine Held not to Imply Authority to Sell Timber.—The fact that a mine superintendent was authorized by the corporation to run a commissary, employ miners, construct miners' cabins, and lease them, and to lease a small area of land for mining coal, all of which powers may be classified as coming within his duties as superintendent of mining operations, does not give him any implied or apparent authority to enter into a contract for the manufacture and sale of lumber for commercial purposes from timber growing upon the corporation's property.

5. Mines and Minerals—Payment as Matter of Justice for Work Done Under Unauthorized Contract Held not a Ratification by Mining Corporation.—The fact that the president of a coal mining corporation, when he ascertained that plaintiff had been cutting timber for the corporation from its property under an unauthorized contract made by its mine superintendent, paid plaintiff for the sawing already done, and agreed that he might saw the logs then on hand, in the belief it was only fair to plaintiff to do so, but with an understanding that no more timber would be cut, does not show a ratification of the contract.

6. Mines and Minerals—Failure to Discover Contract in Excess of Authority Does not Estop Repudiation.—The failure of a coal mining corporation to ascertain that its mining superintendent had without authority made a contract with plaintiff for the cutting of timber on the corporation's property until after plain-

tiff had expended a large sum of money in preparing to perform the contract does not estop the corporation from thereafter repudiating the contract, since one who deals with an agent must inform himself of the agent's right to act and plaintiff therefore assumed the risk of the agent's act being unauthorized.

A. T. BRYSON and JOHN W. WOODS for appellant.

PRICHARD & MALIN for appellee.

OPINION OF THE COURT BY JUDGE MOORMAN—Affirming.

This is an appeal from a judgment of the Pike circuit court cancelling a contract between appellee, Big Run Coal Company, and appellant, W. A. Cole, and enjoining the latter from cutting or removing any timber from a tract of land belonging to the former, or doing any other acts under the contract. The basis of the judgment is that the contract was executed on appellee's behalf by its mine superintendent, John F. Hubbard, who had no authority to make it. A reversal of the judgment is sought on the following grounds: First, Hubbard had express authority from appellee's president, who was the owner of all the capital stock of the company, to enter into the contract; second, if it be found that Hubbard did not have express authority, he was acting within the scope of his apparent authority; third, appellee, through its president, ratified the contract; and, fourth, it is estopped to deny the authority of Hubbard because it neglected to look after its property and to discover that appellant had entered into the contract until after he had incurred considerable expense in preparing to carry it out.

In 1918 appellee was the owner of about 1,700 acres of land near Princess, in Boyd county, a large part of which contained coal. It was engaged in mining coal, and Hubbard was its mine superintendent. He ran the commissary, maintained the equipment, including miners' cabins, and did those things necessary to the superintending of mining operations. The main office of appellee was at Winchester, Kentucky, where its president resided. In the summer of 1918 Hubbard, claiming the right to act for appellee, entered into a contract with appellant, by which appellant was employed to cut and saw timber on the land owned by the mining company. In November of 1918 J. S. Gay, president of the appellee

company, visited the mine at Princess and, as he claims, learned for the first time of the existence of the contract. An issue is made in the evidence as to whether he notified Cole that Hubbard was unauthorized to make the contract and to stop cutting the timber. At any rate, this suit was brought, apparently at the instance of Hubbard, to enjoin the cutting of the timber on a part of the land, and shortly thereafter appellee, through its president, filed an amended petition, seeking a cancellation of the contract on the ground that the mine superintendent had no authority to execute it, and asking for the injunction granted by the court below.

Appellant does not claim to have made the contract with Gay, nor to have received any confirmation of Hubbard's authority prior to Gay's visiting the property in November. He relies on the contract itself as supported by Hubbard's testimony, and on his acts and statements in connection with the operation of the mine, as exhibiting the requisite authority for his action in entering into the contract. Hubbard, who resigned or was discharged from the employment of appellee about the first of December, 1918, testified that he was given authority by Gay, in the summer of 1918, to make the contract. Gay testified that he had only one conversation with Hubbard during that summer; that at that time Hubbard informed him that some miners' cabins were needed, and that he gave Hubbard authority to buy lumber or cut enough from the land to build the cabins, but never authorized the sale of any of the timber. Hubbard purchased the lumber and built the cabins during the summer. The facts relied on by the parties to sustain their respective claims in regard to the extent of Hubbard's authority relate more nearly to what may be implied from his conduct than what he was expressly authorized to do. A circumstance that strongly corroborates appellee's contention is that Hubbard never notified it that the contract had been made, and never reported any payments made on it until after Gay discovered its existence on reaching the mine in November, although at that time considerable work had been done by appellant, and Hubbard had advanced to him a sum approximating $400.00, which it was his duty to report to the office at Winchester.

On the question of express authority there is an issue between Hubbard and the president of the company. The latter's testimony is, as we have observed, corroborated by the circumstance just detailed. The issue was

submitted to the trial court, and it found that no such authority was ever given. This finding in our opinion is sustained by the preponderance of the evidence.

To the second contention of appellant counsel attempt to adapt the principle that special instructions, limiting the authority of an agent whose powers are presumed to be coextensive with the business entrusted to him, must be communicated to the party with whom he deals, otherwise the principal will be bound to the same extent as though the special instructions were not given. It is not shown that any special instructions limiting Hubbard's authority were given. But assuming there were such instructions, the application of the rule would then depend on whether the business entrusted to Hubbard included the apparent power of selling timber from real estate; in other words, whether the right to sever the timber from mining lands for commercial purposes is an incident to the duty and powers of a mine superintendent. None of the authorities cited by appellant affirm the question. In Olive Hill Fire Brick Co. v. Mullins, 153 Ky. 293, it was necessary, in the operation of the plant, to receive and pay for timber hauled to it, and it was held that a contract that the superintendent made to pay for the hauling of timber was within his apparent authority. In that case the superintendent was performing an act incidental to his duties as superintendent of the plant. In this case the sale of timber for commercial purposes had no relation to the superintendency of the mining operations, and hence Hubbard's acts in performing his duties as mining superintendent afforded no evidence of authority to sell the timber.

It has been decided by this court that the president of a corporation is not inherently authorized to make a contract for the sale of its property, and unless the authority is expressly given to him or may be inferred from the company's custom of dealing it is non-existent. This subject was considered in Caddy Oil Co. v. Sommer, 186 Ky. 843, where the president of the corporation had supervision and control over the drilling operations of the company on a certain lease, and it was held that any apparent authority that might be implied from his powers in that respect could not be extended to the sale of the lease, and, in the absence of authority so to do, he was without power to contract for the sale or compensate one for making it. Under that rule it is manifest that

the power to sell timber for commercial purposes is not to be inferred from the general authority to superintend the operations of a mine.

It is insisted that the authority was inferable from the running of the commissary, the employing of miners, the constructing of miners' cabins, the leasing of cabins, and, in one instance, the leasing of a small area of land for mining coal. Hubbard's right to perform the latter act is questioned, and indeed the evidence fails to show that he was authorized to make the lease, or that his action in doing so was ever ratified by the appellee. But aside from that question, there is a wide difference between the leasing of a small area of land for mining purposes and the selling of timber for commercial purposes. The one has some relation to mining operations, and the other none. In fact, every act relied on by appellant as authorizing the inference that the superintendent possessed authority to enter into a contract for the manufacture of timber for commercial purposes may be classified as coming within his duties as superintendent of mining operations. The running of a commissary, the employing of miners, the building and repairing of miners' cabins, the cutting of timber for use in the mine and for the making of cross-ties to be placed in mine tracks, were all necessary to mining operations, and were obviously under the supervision and control of the mine superintendent. On the other hand, the entering into a contract for the manufacture and sale of lumber for commercial purposes was an act wholly unrelated to the powers of a superintendent as such, and the authority so to do was in no sense inferable from the other acts referred to. Hence the court below correctly held that Hubbard was not acting within the scope of his apparent authority in entering into the engagement with appellant.

The claim of ratification is founded on the action of the president of the company in paying appellant for the sawing of some lumber in November after learning of the existence of the contract, and in agreeing to pay for the sawing of the logs that had then been cut. These acts must be considered in connection with the known motives and intentions of the parties. Gay testified that, with the understanding that no more timber would be cut, he paid for the sawing that had been done and agreed that appellant might saw the logs then on hand, believing it was only fair that this should be done. Appellant denied that there was an agreement of that kind. On that point

the lower court found for appellee. Accepting that find-ing, it cannot be held that the conditional promise was a ratification of the contract.

Neither can we adopt the view that appellee is estop-ped from renouncing the contract because of its failure to discover the misconduct of its agent before appellant had incurred large expenses in preparing to fulfill his engagement. It was not incumbent upon appellee to adopt precautions which would prevent the public from assuming the existence of authority for which there was no ground. One who deals with an agent must inform himself of the agent's right to act. He may rely upon delegated authority or upon facts from which it is to be implied. But when neither reliance is available, he can-not act on a groundless assumption and create the authority. The risk of Hubbard's authority was as-sumed by appellant, and appellee's failure to discover the existence of the contract until after appellant had begun to carry it out will not render it valid.

The judgment is affirmed.