## Kentucky-Pennsylvania Oil & Gas Corporation v. Clark et al.

(Decided Jan. 31, 1933.)

440

J. P. HARRISON, PARKER W. DUNCAN, LARIMORE & NICHOLS, and ALEX M. CHANEY for appellant.

N. B. HUNT and DOWLING & BAIRD for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The question on this appeal is whether the appellant, a corporation, is bound by an act of a purported agent in accepting a proposition to buy and exchange certain interests in oil leases. The relief sought and granted was specific performance by the appellant of that contract, which had been repudiated by the company. There is no claim of express authority. The

case is rested upon an agency arising or implied from the conduct and attitude of the company in relation to previous activities of the person assuming to represent it.

The instrument involved is a letter of date August 8, 1931, addressed by Clark and Snyder, appellees, to "Ky-Penna. Oil & Gas Corp., Mr. O. M. Long, Mgr., Horse Cave, Ky.," offering $2,200 cash and an undivided one-fourth working interest in their Sturgeon acreage for an undivided one-half interest in the company's Carter lease. The letter was indorsed "Accepted Ky-Penna. Oil & Gas Corp., by O. M. Long, Mgr." The suit also asked for a reformation of the contract in order to make it more specific as to the description of the properties. The facts are complicated by the creation of a corporation upon the foundation of a partnership and a continuation of the business.

On October 21, 1930, a written contract or partnership was entered into between Frank C. Wilson, L. A. Lovejoy, O. M. Long, and C. E. Lovejoy, for the expressed purpose of "organizing, operating and conducting a company for general contracting but for the time being confining attention to that of drilling for oil, gas, etc." The name of the partnership was "The Ky-Penna. Company." In this contract C. E. Lovejoy was named the manager and given power to buy and sell and "full and complete power of attorney * * * to manage any and all of the affairs of the company as in his judgment shall seem necessary and proper during the time necessary to fully pay for said equipment," and the repayment of $2,000 advanced by Wilson.

Long testified for the plaintiffs. He says that at the first meeting of the partners there was a modification of the written agreement, or rather that, without any reference to it, it was agreed that the venture should be broadened to include the buying and selling of leases, and that, because of his greater experience, he became manager and superior in authority to L. A. Lovejoy. Both of them became residents in the oil field, and each was to receive a salary. He says they never operated under the written partnership covenant, and that he was verbally given authority by his three associates to make contracts and to acquire, sell, and transfer leases even after the corporation was formed,

and that he continued in this relation until after the transaction involved in this suit. It was understood from the beginning that he was to supersede C. E. Lovejoy as manager, and that the corporation was to be later formed on the same basis; the partnership being terminated. This is denied by the other parties. Whether there was such specific understanding or not, the fact is that Long became the active representative in the field, although L. A. Lovejoy, secretary and treasurer, was living there, and was generally consulted by Long in the negotiations conducted by him, and seems to have had about as much to do with all those transactions, other than that involved in this suit, as did Long. C. E. Lovejoy, designated in the articles of partnership, and who later became president of the corporation, lived in Louisville and was frequently in Hart county.

A Delaware corporation was formed in the latter part of December, 1930, by the two Lovejoys and Wilson, with the name of "Kentucky-Pennsylvania Oil & Gas Corporation." Its charter powers were very extensive, and covered every phase of business relating to oils and gas. The evidence is that there were at the time involved other stockholders than the three organizers. Long was not a stockholder. C. E. Lovejoy was chosen as president and L. A. Lovejoy as secretary and treasurer, and Wilson as vice president. According to Long, he assumed that this was a formality, and that he continued to have a one-fourth interest in the business as before. He testified, however, he realized after the formation of the corporation that he had no power to bind the company or its officers in the matter of assigning or conveying property of the company, and that it had to be by the officers, and that he had not signed any paper which might have had that effect until the one involved in this litigation. As to it, he intended to bind the company.

The other side is to the effect that the corporation was not a continuation of the partnership, but was formed for a different purpose, that is, to deal in and develop oil and gas leases, the partnership being continued only as a drilling company until its affairs could be wound up by payment of its debts. Up to that time there had been no profit. Whatever may have been the plan, the fact is that the relations became so interwoven

as to constitute a merger so far as the public was concerned. While it appeared that the title to the two drilling rigs was not transferred to the corporation, the latter did take over the partnership's leases and pay their debts. Subsequent transactions by this group of men were had in the name of the corporation. The same men conducted its affairs in the locality of operations in the same manner as theretofore. It is fair to say that Long's associates, officers of the corporation, testified that Long was given no authority to act for the corporation, that his services for the partnership had been unsatisfactory, and one of the reasons for forming the corporation was to close their association with him as a partner. Of course, when the corporation came into existence, the authority which Long had possessed as a partner ceased.

As the case is predicated upon the doctrine of agency created by implication from the facts, we must review the activities of the one whose act is involved before that which became the subject of the suit.

There were several contracts made by Long for the drilling of oil wells. In some the consideration was all cash and in three instances part cash and transfer to the company of interests in leases of undeveloped territory. It appears that in these transactions which involved leases, one or more of the officers of the corporation were consulted before the deals were closed. One of them, called the "Sweet Contract," was made before the corporation was formed. After negotiating with Long, Chenault, an oil operator, was then presented to the other partners, and before closing the contract he was careful enough to inquire of them as to Long's authority. He testified:

"As I remember they told me that Mr. Long was in charge of the two drilling machines and their operations and whatever we did would be all right with them. That is, that whatever Mr. Long and us did was all right."

This is not susceptible to saying he had authority to sell real estate of the subsequently formed corporation.

The company had acquired through Long a large acreage in the Logsdon valley. He secured the services of a broker, and through him Hupp was located and

agreements made whereby a half interest in the leases was to be assigned to Hupp in consideration of his bearing the cost of drilling a well, and a one-fourth interest was assigned to the broker for his services. Even though the lease stood in the name of Long individually (one of the practices about which his associates complained), before Chenault would close up the deal he testified he assured himself by a specific inquiry of the Lovejoys as to Long's authority in this matter also. The evidence shows that this matter was considered by all of the parties, and that the contract was made and formally executed by the corporation. It seems that the negotiations were begun before the corporation was formed, but consummated afterwards. This incident does not show any custom of dealing or holding out of Long as an agent with power to sell real estate.

On another occasion, in which partially blank executed assignments were placed with Long, all of the evidence shows that they were for two certain tracts in the Logsdon Valley, which all of the parties had agreed upon selling. The definite boundaries were omitted because not available when the instruments were prepared. Corbett, a broker, found the buyers. Long was given express authority here, after the whole thing had been fully considered by the board of directors. Nevertheless, before closing the deal, he consulted L. A. Lovejoy, the secretary and treasurer of the company, and secured his approval.

Another contract, or perhaps a group of contracts, was made in Hardin county by Long. They were to drill four wells for a consideration, part cash and part interest in the leases. Both the Lovejoys were consulted before this was done, and they were made with their approval.

A contract was made by L. A. Lovejoy and Long to drill a well for part cash and an interest in the lease of the Fitzgerald farm. A 39-acre Meredith lease had been bought by Long for $39 for the company, and a contract similar to the Fitzgerald one was made. This was at the special instance and under express authority of all of the associates. It seems that both of these transactions were had for the partnership, but, whether for the partnership or corporation, they certainly are not proof of an agency to sell real estate.

Of particular interest is a transaction had with the appellees other than the one involved in this litigation. It is called the "Bush deal." The company owned a lease of about 450 acres. Long negotiated a deal with Clark, Snyder, and others whereby the company should assign to them one-half of the acreage. They were to bear the cost of drilling a well (to be done by the company), and after its completion re-assign 75-acres to the company. Clark and Snyder testified that they knew Long was associated with and working for some one else, but at the time they did not know who or just what his relations were. Long told him he was manager or agent of his associates. He testified that he did not consult them, but they testified that the whole matter was gone into thoroughly by the board of directors of the corporation, and they conferred with Clark and his group before the contract and assignments were executed, which was on February 14, 1931. They regarded the matter as a mere offer, secured by Long, to be rejected or accepted. In their depositions Clark and Snyder testified there was no writing signed by Long in connection with this transaction, and Long testified repeatedly and unequivocally that he had not given them a written option and had not executed a paper of that character. He was positive he had not done this because he knew that he had no authority to bind the company, and, when asked specifically about this Bush deal, positively stated there was no writing. Up to about the time the case was submtited, the record thus stood, and showed there was never any similar transaction conducted by Long in a similar way to that involved in the litigation. Then it was stipulated by the parties, in order to save recalling witnesses, that Clark had found a letter in his files, of date February 10th, addressed to himself confirming a conversation and outlining the agreement above stated and signed "Ky-Penna. O & G Corp., By O. M. Long, Mgr."

In view of the very positive testimony of all three parties concerned, the late hour at which the letter was produced, and the fact that Long at that time had gone over to the other side, and was then in the employment of Clark and Snyder, we think the appellant is justified in looking with suspicion upon this letter. However, it does not seem to be controlling in the decision of the case. It is not claimed that the officers of the cor-

poration knew of this preliminary contract when they considered the proposition or closed the deal by execution of the formal papers. That being so, the subsequent action of the corporation cannot be regarded as a ratification of Long's act, for, as said years ago by the Supreme Court of the United States, in the case of Owings v. Hull, 9 Pet. 607, 629, 9 L. Ed. 246:

> "No doctrine is better settled, both upon principle and authority, than this—that the ratification of an act of an agent previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts. If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded in mistake or fraud."

See, also, Short v. Metz Co., 165 Ky. 319, 176 S. W. 1144; Caddy Oil Co. v. Sommer, 186 Ky. 843, 218 S. W. 288; Inter-Southern Life Insurance Co. v. First National Bank, 178 Ky. 95, 198 S. W. 563.

Coming to the transaction involved in the case: The officers of the company and Long, in February, 1931, had agreed with Moore, the owner of the Carter 84-acre lease, to accept a half interest and $500 for drilling a well on it. The lease was taken in Long's name. He says it was so taken as a matter of convenience, while the others say it was done without their knowledge or consent. Long testified that the company was hard up for money, and that a well was being drilled on a nearby Larimore lease and had shown signs of oil. He received numerous offers for the company's half interest in the lease. Negotiations were opened with Clark and Snyder, and, when their offer was made, four or five days later, he consulted L. A. Lovejoy, secretary and treasurer of the corporation, who thought it was a good trade, and then he closed the deal by accepting their written offer. Formal assignments were prepared and mailed to C. E. Lovejoy, president of the company, for execution. Long says that L. A. Lovejoy wired his brother to hurry execution of the papers, and Clark says that he expressed no disapproval of the deal, and daily expected the return of the assignments, and stated he could not understand the delay. L. A. Lovejoy testified that Long had submitted a mere proposal to him, and he had in turn submitted it to the other

officers before August 8th, the date of the writing. This was upon the assumption that it was like other propositions which had been secured by Long to be accepted or rejected, and upon that assumption the papers had been prepared and sent to the other officers of the company. However, it appears that a day or so later Long left this accepted written offer and some other papers in L. A. Lovejoy's room. He then learned of it, and told Long that he had overstepped himself, and that he did not think the writing was any good. Upon hearing from his brother C. E. Lovejoy, he informed Clark and Snyder that they were objecting to selling the lease, but Wilson and C. E. Lovejoy would be down soon. To this they responded that they considered it a deal. This is contrary to Clark's evidence that they never received any information of that kind until after Wilson and C. E. Lovejoy came to Horse Cave a few days later. C. E. Lovejoy, president of the company, testified that he received a telegram from L. A. Lovejoy that the offer had been made and promptly got in touch with Wilson. They agreed to decline the offer, and so notified L. A. Lovejoy at Horse Cave. His letter to that effect is filed in the record. It bears no date, but there is filed the envelope in which it was sent and it bears the postmark of Dubois, Pennsylvania, dated August 15th.

The evidence of Wilson and the two Lovejoys is that it had been previously expressly agreed, and statements to that effect had been made in the presence of Long, that this and the Bush 71-acre lease would not be sold and that they were going to "gamble on them." This is not denied by Long. He says that, while he had no special instructions to sell the lease or to try to sell it, it was generally understood that he would act for the best interest of the company under a general authority which had been given him verbally by the members of the board of directors, collectively. He did not think the company could afford to let the chance go by. There were two dry holes in the nearby lease where a well was being drilled which was showing some signs of oil, but it could not be told what the development would be.

Wilson and C. E. Lovejoy came to Horse Cave on August 20th, and that night, when Long became so insistent upon them closing up the deal as to arouse their

suspicion, they asked Long if he had signed any papers about the matter, and he then for the first time told them he had done so. They then and there repudiated the transaction, and so informed Clark the next day. It seems that the nearby well had come in on the 19th, as a good producer. But Wilson and C. E. Lovejoy say they had no knowledge of it until the morning after their arrival in Horse Cave, which was following the conference with Long the night before.

Concerning the authority thus to bind the company, Clark testified that he made no specific inquiry about it, and had received no information regarding his powers. He felt that he was dealing with the company's authorized agent because of his previous transaction in connection with the Bush lease, which had gone through without difficulty. Appellees had no knowledge of Long having made any other contract of this nature except that in the Bush deal.

The petition merely charges that Long was the defendant's manager and agent. The answer traversed this, and alleged that he had no power as its agent to sign the acceptance of plaintiff's offer. When the case was ready for trial, an amended reply was filed in which the plaintiff, ''to conform to the proof,'' pleaded in substance that the act was within the apparent scope of Long's authority, and that the company was estopped to deny liability for the contract sued on upon that account. This last ground, however, seems to have been abandoned, as well it might be; for an apparent or ostensible agency rests upon estoppel, and, before a third person can invoke that plea, he must have suffered some injury or have been caused to change his position in reliance upon the representations of the purported agent, although he may have acted in good faith and in the exercise of reasonable prudence on the faith of appearances. 2 C. J. 464. The appellees never altered their position nor suffered any hurt in this instance, for this claimed contract remained executory until it was repudiated by the claimed principal, and the parties were in no way affirmatively affected by reason of the informal offer and acceptance.

The case is rested upon what is sometimes termed an ''implied appointment,'' as where the circumstances and facts prove there was an actual agency and author-

ity, notwithstanding a categorical denial by the purported principal. This subject is considered in Louisville Cement Company v. Clell Coleman & Sons, 222 Ky. 183, 300 S. W. 633.

There is a distinction to be drawn between such an actual agency (which is but an inference of fact) and an ostensible agency. Mechem, sec. 244. It is thus expressed in 2 C. J. 444:

> "Implied agency does not include, and is, technically speaking, distinguishable from, agency by estoppel, although the two are usually confused and the courts as a rule do not attempt to make any distinction, but use the two terms synonymously. An implied agency is an actual agency and is a fact to be proved by deductions or inferences from other facts, while in a strict sense agency by estoppel should be restricted to cases in which the authority is not real but apparent. As to third persons the principal is equally liable in the case of implied agency and agency by estoppel, although this distinction is to be noted, that agency by estoppel can be invoked only when the third person knew and relied on the conduct of the principal, while in cases of true implied agency he need have had no knowledge of the principal's acts, nor have relied on the same; the agent by implied authority being an actual agent, the principal is liable for his acts the same as though the authority had been express.
>
> "As between the principal and agent the distinction between implied agency and agency by estoppel is vital. An agent by implied appointment is a real agent with all his rights and liabilities; an apparent agent, an agent by estoppel, is no agent at all, and as against the principal has none of the rights of an agent."

Appellees quote the above extract, and plant their case squarely upon it and the Louisville Cement Co. Case.

In that case it is indicated that, in order to bind the purported principal, the transaction relied upon must be of the same nature as that involved. We may therefore well put aside all the transactions of Long except the Bush deal. They related altogether to contracts for drilling wells, and in some instances to ac-

cepting leases in part compensation for that work. They show him to have been a "scout" in the field, finding propositions with respect to selling or otherwise disposing of leases and submitting them to the officers of the company for their acceptance or rejection. They are not only dissimilar in character, but were conducted in a different way. To constitute binding precedents, transactions must not only be of similar things done, but of things done in a similar way. Mechem on Agency, sec. 263.

As we look in the evidence further, we may well bear in mind certain applicable legal principles.

There is no presumption of agency; it is a fact to be proved; and the person who alleges it has the burden of proving it. Mechem on Agency, sec. 255; Rice & Hutchins' Cincinnati Company v. J. W. Croghan & Co., 169 Ky. 450, 184 S. W. 374; Dodds v. Maryland Casualty Co., 166 Ky. 70, 178 S. W. 1134; Inter-Southern Life Ins. Co. v. First National Bank, 178 Ky. 95, 198 S. W. 563.

Neither an agency nor the scope of it can be established by proof of the declarations of one claiming to be an agent, and such representations cannot bind one as principal. Garrett v. State Tobacco Warehouse Co., 153 Ky. 1, 154 S. W. 376; Ewing v. Bond, 185 Ky. 781, 215 S. W. 934; Larkin Co. v. Com., 172 Ky. 106, 189 S. W. 3.

The governing power of a corporation is vested in its board of directors, and they can bind it only when acting as a body. Caddy Oil Co. v. Sommer et al., supra. This does not prevent it being bound under the "apparent scope or authority" rule, of course, but it does require greater care, otherwise it and its stockholders, who must act wholly through agents, would be at the mercy of any employee, regardless of the limitations of his specific authority.

So it is held with respect to an agent of a corporation or even a major officer that it is incumbent upon the one dealing with him to look to his authority if he seeks to bind the corporation, and cannot act on a groundless assumption. Caddy Oil Co. v. Sommer, supra; Cole v. Big Run Coal Company, 199 Ky. 49, 250 S. W. 490; Harding v. Ky. River Hardwood Co., 205

Ky. 1, 265 S. W. 429. And the mere representations of the claimed agent, even when coupled with signing a paper in such capacity, are not sufficient to show his agency or the extent thereof. Short v. Metz Co., 165 Ky. 319, 176 S. W. 1144.

Ordinarily a vice president and general manager is without authority to sell and dispose of all its assets, even though full power to conduct a company's business had been granted by formal action of the board of directors. Elk Valley Coal Co. v. Thompson, 150 Ky. 614, 150 S. W. 817. Hence such an act is not within the apparent scope of his authority. Empire Coal Mining Co. v. Empire Coal Co., 183 Ky. 699, 210 S. W. 474. Nor can the secretary of a corporation bind it in the purchase or sale of its property without special authority. Main Street Warehouse Co. v. Bain Moore Tobacco Co., 198 Ky. 777, 250 S. W. 98. A general manager only has implied power to do customary acts in the business, and cannot bind his principal by acts beyond his apparent scope. Kentucky River Coal Corporation v. Williams, 226 Ky. 93, 10 S. W. (2d) 617; Caddy Oil Co. v. Sommer, supra. A superintendent can only do what is within that scope, and his act must be shown to have been in the course of ordinary business of the corporation. Rasnick v. W. M. Ritter Lumber Co., 187 Ky. 523, 219 S. W. 801.

In the instant case, the representative of the corporation whose act it is claimed bound the company was only a superintendent of operations, whose word only the other parties had as to any authority to dispose of its property. That was not enough, as indicated above.

A principal is never bound where the person dealing with his agent knows, or has reason to know, that he is exceeding his authority. Ryan & Miller v. American Steel & Wire Co., 148 Ky. 481, 146 S. W. 1099; Nolin Milling Co. v. White Grocery Co., 168 Ky. 417, 182 S. W. 191. Limitations on authority are operative against third persons who have or are charged with notice. Mechem, sec. 801. It seems to us the experience of these men in the Bush deal and knowledge then acquired were sufficient to put them on notice as to Long's connection with the company, and that he could not bind it in such matters rather than to indicate the converse.

Parol agency to sell real estate musᵤ be established by clear convincing proof, else the purposes of the statute of frauds are destroyed. Mechem on Agency, sec. 229; 2 C. J. 451. It is a dangerous doctrine in all events, and many states require written authority. Mechem, sec. 223. An agent's authority to sell real estate is not to be readily inferred, and the intention of the principal to give him such authority must be plainly manifested. It must be clear and distinct, and of such a character that a fair and candid person may say without hesitancy that the authority is given. 2 C. J. 609; Mechem, sec. 230, 802.

> "Authority to sell or to sell and convey land will not be inferred from a general power to * * * attend to the principal's business or property, even though the land is acquired in carrying on the principal's business; or from a previous authority to sell, even though the agent is able to sell on the terms then authorized; or from being put in posession of the property. * * * Nor will such power be implied from an authority to purchase land or from a power to locate and survey lands, or to locate and acquire for the principal the land in question; or from a power to demand and receive real estate on behalf of the principal, or to receive proposals to purchase land and submit them to the principal."

2 C. J. 610. Even where the authority to sell real estate has been given by a formal document, it must be strictly construed without extension by interpretation. 2. C. J. 611.

In conclusion, we turn to the well-established rule that specific performance of a contract of sale of real estate does not go as a matter of course, but is witheld or granted according as equity and justice seem to demand under the facts and circumstances. Clifton Land Co. v. Reister, 186 Ky. 155, 216 S. W. 324.

> "To authorize a court of equity to exercise its jurisdiction compelling the specific performance of a contract, it must be reasonably certain as to its subject-matter, its stipulations, its purposes, its parties, and the circumstances under which it was made."

McKnight v. Broadway Investment Co., 147 Ky. 535, 145 S. W. 377, 380.

We conclude, therefore, that the appellees were not entitled to the order of specific performance of the paper sued upon and as reformed.

Wherefore judgment is reversed, with directions to enter another in accord with this conclusion.

Whole court sitting.