# American Nat. Red Cross v. Brandeis Machinery & Supply Co. et al.

March 25, 1941.

Andrew Duncan, Jr., Trabue, Doolan, Helm & Helm, Andrew Duncan and Harris W. Coleman for appellant.

Woodward, Dawson & Hobson, Gordon, Laurent, Ogden & Galphin, Hal O. Williams and Gavin Cochran for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The case arises out of the catastrophic flood of 1937 which inundated two-thirds of the city of Louisville.

We closely abridge the pleadings. The petition of the Brandeis Machinery & Supply Company against American National Red Cross, a federal corporation, 36 U. S. C. A., Section 1 et seq., and W. J. Rahill, al-

leged that during the emergency, at Rahill's instance, the plaintiff had delivered 19 pumps and accessories of the value of $4,805.86 to the temporary place of business and operation of the Red Cross in Louisville; he had represented himself as being the authorized agent of the Red Cross, and plaintiff had relied upon that representation; the Red Cross denied Rahill's agency and authority; Rahill insisted upon it, and both parties denied liability. It was alleged that plaintiff did not know which state of fact was true, that is, whether Rahill was the authorized agent or not, and that there existed an actual controversy among the parties. A declaration of rights was asked and judgment for the amount stated was prayed against whichever defendant should be declared liable. Rahill questioned the plaintiff's right to a declaratory judgment and to maintain the action against himself and another alternatively, and denied personal liability, alleging his authority to buy the pumps for the Red Cross to whom they had been delivered. The Red Cross did not question the propriety of the plaintiff seeking a declaratory judgment. It denied Rahill's agency and its liability, alleging that the pumps had been bought for the City and the Louisville Trust Company, and made its pleading a cross-petition against them and Rahill, but prayed no relief against any of them. In effect it simply said to the plaintiff, "Here are the responsible parties." But the plaintiff did not accept or undertake to hold either of them. The Red Cross elaborately set up the tender of its service to the City, County and State and its agreement with the Mayor's Committee for Flood Relief and pleaded its limitation of financial liability, as will be developed in our summary of the evidence. The court sustained the cross-defendants' motions to strike from and special demurrers to this pleading, and, when the Red Cross declined to plead further, dismissed so much of it as purported to be a cross-action.

There remained only a suit by the Brandeis Company against the Red Cross and Rahill seeking declaration as to whether the relation of principal and agent existed, and judgment consistent therewith for the value of the pumps, and the defendants' respective answers joining issue. A jury trial was had, and at the close of the evidence the court gave a peremptory instruction to return a verdict for Rahill and for the plaintiff against

the Red Cross for the amount sued for. Judgment was accordingly entered.

The Red Cross appeals from the judgment dismissing its cross-petition and that rendered against it for the value of the pumps.

The City and the Trust Company have moved to dismiss the appeal from the orders discharging them upon the ground that as a suit seeking a declaratory judgment, the appeal must have been filed within 120 days after its rendition. The final judgment in favor of the Brandeis Company was entered within 120 days of the filing of the appeal but that dismissing the other parties was not, there being an interval of 25 days between the two judgments. They also submit the further ground that a single appeal cannot be taken from four separate judgments in favor of four different parties (see Matney v. Edmonds, 179 Ky. 836, 201 S. W. 465), hence there is presented only an appeal against the first named in the statement of appeal, that is, the Brandeis Machinery & Supply Company. Rahill submits that ground and also that as the appellant, Red Cross, was not aggrieved by the judgment dismissing the plaintiff's claim against him it may not appeal therefrom

Rahill also presses his point as to the impropriety of a suit for a judicial declaration as to which of two parties is liable for the payment of a claim, and maintains the trial court should have sustained his motion to require plaintiff to elect.

It is, of course, conceded that under the terms of Section 113, Subsection 4, of the Civil Code of Practice, a party may not plead liability alternatively against one or another defendant. It is maintained, however, that such may be the practice in a declaratory judgment proceeding. Section 639a—6, 639a—9, Civil Code of Practice. The foreign cases construing the practice under the Uniform Declaratory Judgment Act in this respect are not harmonious. Manchester v. Townshend, 109 Vt. 65, 192 A. 22, 110 A. L. R., 811, and annotations. Since the trial court exercised its discretion not to make any kind of declaration of rights and treated the action as one at common law, we shall follow that course and decline to rule upon the points raised as to the propriety of the proceeding or of the particular practice. And our conclusion as to the merits of the case makes it needless

to pass specifically on the motions to dismiss the appeal. We shall treat them as timely and proper against all parties.

Inasmuch as no party, particularly the Red Cross, asked any relief or judgment against the City of Louisville or the Louisville Trust Company, it was proper to dismiss the cross-action against them, for as has often been said the court will not thrust upon a party something he does not ask. Holt's Adm'r v. Johnson, 247 Ky. 180, 56 S. W. (2d) 962. It should be said in explanation of the omission that counsel assumed the suit to be properly one for a declaration of rights as the plaintiff designated it, and brought in these parties in order that there could be a complete declaration. Ex parte Hirsch's Committee, 245 Ky. 132, 53 S. W. (2d) 211.

There emerges for our consideration only the question of giving the peremptory instruction in favor of the plaintiff, Brandeis Machinery & Supply Company, against the American National Red Cross. The Brandeis Company has not prosecuted an appeal from the judgment in favor of Rahill. The decision turns on the question of whether the evidence as a whole shows as a matter of law that Rahill was at the time an agent of the Red Cross, or there was a ratification of his purchase of the pumps by their acceptance or assumption of control by its unquestioned agents.

It is impracticable to review even as a summary all the evidence introduced during the trial, which covered four days. That is particularly true as to evidence collateral to and corroborative of the primary or essential facts. It will be understood that some of the statements of fact are our conclusions in respect thereto.

By Saturday, January 23, 1937, there had been perfected a volunteer organization of citizens known as "The Mayor's Committee for Flood Relief" to render service to the stricken inhabitatnts. The Mayor, Hon. Neville Miller, had placed W. J. Rahill, president of the Louisville Trust Company, in charge of buying whatever should be needed. The national organization of the Red Cross, the Public Health Service, and other outside agencies began to come to the aid of the stricken territory. On that Saturday, Nat C. Wilson, Director in Charge of Emergency Relief of the Red Cross, came. He was in conference with the Mayor and others of the

local committee that night and Sunday. It is uncontradicted that Wilson advised Rahill to go on like he had been doing and that Rahill did so in the matter of making purchases of supplies without any question. Mayor Miller and others testified that Rahill had been especially assigned as the Committee's representative to assist or work under Mr. Wilson, though he says that Mr. McKim, president of the Stewart Dry Goods Company, was so designated. We think it clear from all the circumstances that it was later that Mr. McKim became associated with him. Early in this period Wilson stated the need for two assembly and distribution warehouses or stations for the Red Cross. Rahill, who was director of the Louisville Railway Company, was instrumental in procuring a car barn in the Highlands as one of those stations. A. S. Lewis, Jr., a local citizen, was placed in charge. On Monday morning, the 25th, Wilson informed the Mayor and some of the committee that the National Red Cross had made appeals to all its local chapters for help for the sufferers from the flood throughout the Ohio valley, and questioned the wisdom of both the City and the Red Cross appealing for funds. During the conferences the question was raised as to who would pay for the things being bought. Wilson stated that if the City would "step out of the picture" the Red Cross would take charge; and it was so agreed. All of this resulted in the following communication addressed to J. McFerran Barr, Chairman of the Committee, on Tuesday, January 25, 1937:

"Dear Mr. McFerran:

"Referring to our conferences of today on methods of raising flood relief funds, this letter will confirm statements made by me during the said conference.

"1. To request the Mayor to issue a proclamation requesting all contributions for flood relief be made to the Louisville Chapter of the American Red Cross.

"2. All funds received to date by your committee will be turned over to the said Louisville Chapter.

"3. It is agreed your Committee and the Mayor will actively support and encourage contributions to flood appeal.

"4. The American National Red Cross and the Louisville Chapter will acknowledge and pay commitments of any nature made by the said Mayor's Flood Relief Committee up to date of transfer of said funds now in your hands as chairman of the Committee, excepting such purchases made for the city departments of Louisville.

"5. After transfer of such funds all future purchases made by the Mayor's Committee during the emergency will be made through a central purchasing office, said office to be staffed by the American National Red Cross.

"6. The American National Red Cross and the Louisville Chapter agree to establish an office to register for rehabilitation all disaster sufferers of the City of Louisville, said rehabilitation to be the usual rehabilitation given needy disaster sufferers by the Red Cross.

"7. The necessary personnel to carry out the rehabilitation program will be selected by the American Red Cross through its local disaster director.

"Sincerely yours,
"(Signed) Nat C. Wilson,
"The American National Red Cross."

Wilson drafted a proclamation in collaboration with Rabbi Rauch for the Mayor to deliver in reference to contributions to and the assumption of the relief situation by the Red Cross. Mayor Miller modified the draft by eliminating a part which would have proclaimed that the Red Cross was taking over all municipal functions. Otherwise, the proclamation, which the Mayor read over the radio, was in accordance with the terms of the above communication. There was no other solicitation of funds made by or in behalf of the City except through the Red Cross. But the agreement confirmed by the letter was modified if not by express agreement then by concurrence in a different action subsequently taken. At this time the Red Cross did not have any personnel in the City and the Committee continued to function as before, but under Wilson's supervision or with his advice. It is to be observed that the Red Cross agreed to pay all commitments made by the Committee up to the time funds in its hands were turned over to the Red

Cross, excepting only for such purchases as had been made for the City Departments; and, further, that when the funds should be turned over all future purchases would be made through a central purchasing office staffed by the Red Cross. The funds were not turned over to that organization until February 12th, after the flood receded. But the Red Cross established a purchasing department January 29th, which was after the pumps had been bought. Even so, Rahill and his assistants continued as purchasing agents definitely for the Red Cross. Meanwhile, it clearly appears that Wilson and other representatives of the Red Cross had assumed general charge of the situation, working exclusively through the Committee and other local volunteer citizens. Rahill had continued to make purchases, using his discretion as theretofore. Wilson moved from the headquarters of the local chapter of the Red Cross into the City Hall, either in the same office occupied by Rahill or near by.

On the afternoon of January 26th, Richard F. Allen, manager of the Eastern area of the National Red Cross, with headquarters in Washington, arrived by plane. He testified that he came at the suggestion of President Roosevelt. That evening there was a meeting with the Mayor and the Committee, including Rahill. Policies of the Red Cross were discussed and Mr. Allen testified he explained that his organization would not bring in any outside help but required the help of the local citizens except in the matter of supervision. Pertinently, he advised the Committee, "we would, of course, require them to help with the purchase of necessary supplies to meet the needs of the individuals and families who were affected and who were unable to help themselves." He testified that some concern was expressed about payment for supplies already purchased and that he advised the Committee that the Red Cross would assume responsibility for all supplies for human needs but not for the normal functions of the City, County and State governments. The supplies, the payment for which the Red Cross assumed and would have assumed responsibility, were of the nature described in a pamphlet defining the policies of the organization in disasters as being for the necessities of life, which were usually confined to food, clothing, shelter, and the establishment of refugee camps. Mr. Allen explained that Wilson was at the

City Hall as a representative of the Red Cross to supervise the work and for consultation, but would not buy any supplies himself. Allen left Louisville on the afternoon of the 27th.

This was the situation and relationship of the Red Cross when the pumps were acquired. Mr. Rahill related that he was having frequent calls for pumps to remove water from basements of buildings, some of which were being used in the relief work. On Wednesday, the 27th, he communicated with J. A. Paradis, president of the Brandeis Machinery & Supply Company, and informed him that he was representing the Red Cross and asked if his firm could supply any pumps. Some had been ordered for the Louisville Gas & Electric Company and were on the way from the factory in Ohio. The Company agreed to release its order to the Red Cross, and Rahill bought them. Paradis testified that Rahill stated over the phone that Mr. Wilson of the Red Cross was there by his side confirming what he was doing, and John R. Lindsay, Director of the Welfare Department of the City, testified that he and Wilson were present and the three men conferred about buying these pumps. However, Wilson testified he was not there and knew nothing about them, and Rahill remembered no special conference with him about them. Paradis had established his company's headquarters at his residence in the Highlands, and the pumps were brought there for delivery. They were taken to the station being operated by the Red Cross in the car barn. Lewis at first declined to receive them, suggesting they were intended to go elsewhere. Someone at the City Hall, probably Rahill, communicated with him and told him to accept the pumps and he did so. An outside representative of the Red Cross, Wm. D. Fraser, assigned to the station by Wilson, testified when the pumps came he refused to receive them and advised Lewis who was in general charge, that he was there to handle food and nothing else.

It is shown that some of these pumps were taken to and used at the Armory, through which 85,000 people were evacuated from the City and where there were always from 8,000 to 10,000 refugees. Some of them were used at the headquarters of the county officers and their helpers. Two or three were sent to the Tyler Hotel, where there were a number of refuges, as well as pay-

ing guests, and where food was being cooked and carried out to those in need. Two of the pumps were used in the building of the Louisville Trust Company. The distribution of the other pumps was not definitely or satisfactorily shown. It appears that excepting those at the Louisville Trust building and at the Tyler Hotel, the other pumps eventually found their way into the possession of the W. P. A., and were used in rehabilitation service. There is much said concerning the pumps going to the Trust Company building. Rahill testified that he probably told Beeler, who was the head of the company's real estate department and who told him that there was danger of the building collapsing, that pumps might be obtained from the Highlands station of the Red Cross. Rahill had nothing else whatever to do with their acquisition or use in the building. No business was being carried on there, but it appears there were a number of employees in the building either as refugees or helpers to those in distress. Mattresses were spread on the floor and a time or two Rahill retired there for a few hours' sleep during the hectic week.

By February 12th water had receded. Members of the Committee and representatives of the Red Cross held a meeting that night at which it was agreed that the funds which had come to the City authorities or representatives and were payable to the Red Cross, should be delivered to it, and those payable to the City retained by the Committee. Where the checks were not specifically ear-marked the money was divided equally. The exact amount that was turned over at this time to the Red Cross is not definitely disclosed, but there was about $21,000 in checks made payable to that organization. The Committee retained something over $96,000, and paid for purchases made by Rahill, a list of which was filed. It is to be remembered that early in the disaster, at the request of the Red Cross, the Mayor had asked over the radio that all funds be sent to the Red Cross. After that there was comparatively little money coming directly to the Committee.

Of all the items bought by Mr. Rahill, the Red Cross declined to pay only for several carloads of lime, considerable confiscated whisky and these pumps. The former two items were paid for out of the funds retained by the Committee. Its money was exhausted and they have insisted that the Red Cross bear the expense of

these pumps as being a legitimate charge. Mr. Allen testified that the Red Cross expended close to Five Million Dollars in Jefferson County. It would appear that most of this was for rehabilitation after the water had receded.

Reverting to the declared policy of the Red Cross to pay only for those things classed as being for human need, such as food, clothing, and shelter, it is admitted that that organization spent $4,500 for the building of a pontoon bridge across a low place to give access to the eastern part of the city, and paid for the flooring in tents erected for refugees. It likewise bore much of the expense incident to the supplying of boats where such were not gratuitously furnished by the owners. So it may be said that the general policy was not closely observed where there was need to be met. On the other side, it appears that the City's Committee paid $6,000 for food, about $2,500 for lumber for boats, some $700 for hotel expenses for workers, and other items which seem to be within the class of expenses the Red Cross assumed to bear. Be that as it may, the outstanding fact is that unless the Red Cross was functioning through Rahill and other members of the Mayor's Committee, it was not functioning at all. This Committee, as we have indicated, was composed of the leading professional and business men of the city. Their heroic, loyal and sacrificial service under the leadership of Mayor Miller is well known contemporary history. They yielded direction to the Red Cross and its experienced officers who came to their aid, and continued under that supervision. It is admitted that everything that was purchased for the Red Cross by Rahill was paid for except these pumps and the two items mentioned. True, it is insisted that the Red Cross assumed to pay only for those things which supplied human needs. That included shelter. The use of some of these pumps at the places described above was to provide heat in the buildings where refugees and workers were being sheltered and cared for. Under the circumstances their purchase and use was necessary.

It is elementary, as appellant says, that agency cannot be proved by a statement or declaration of one claiming it. But such statement is competent evidence on the question of whether a third party to a transaction had dealt with an alleged agent as an agent or as

an individual principal. ''On such issues,'' it is said in 2 Am. Jur., Agency, Section 445, ''the declarations of the alleged agent, asserting the fact that he is acting in the capacity of an agent, lose their character as hearsay, since the truth of the assertions is immaterial, the evidence being offered only to prove that the alleged agent purported to act in that capacity, or to show that the third party undertook to contract with a principal through the alleged agent.''

We disregard the testimony that Wilson was present when Rahill conferred with Paradis and bought the pumps over the telephone, and to test the peremptory instruction accept as true that neither Wilson nor any other official of the Red Cross had express knowledge of the transaction. That Rahill believed in good faith that he was authorized to buy these pumps for the Red Cross cannot be doubted; nor that the plaintiff's president so understood. It is equally clear that the Red Cross had expressly committed itself to pay for all supplies bought by Rahill that came within its category of ''human needs'' and had authorized him to continue his service— at least until such time as it should establish its independent purchasing office. The Brandeis Company had no knowledge of the claimed limitation of Rahill's authority. On the contrary, it had not only his representations but the proclamation of the Mayor to the public that the Red Cross had come to the aid of the stricken city and had assumed control of the relief service. All of the circumstances went to show that Rahill had such authority. The pumps that were used to remove water from the furnace rooms of buildings sheltering refugees and relief workers may be classed as within the category of ''human need.'' The others whose disposition and use were not definitely shown may be placed outside the class, although the division line is obscure—as was recognized in the payment by the Red Cross of the cost of the pontoon bridge and other items as above stated. These facts are established by admissions and uncontradicted evidence. Upon them the case may be decided without considering the theory on which the trial court seems to have rested the peremptory instruction, namely, the acceptance of the pumps and the exercise of control over them at the station of the Red Cross where they were delivered. See Louisville Tin & Stove Company v. Lay, 251 Ky. 584, 65 S. W. (2d) 1002.

We cannot escape the view that considering the evidence in the light most favorable to the Red Cross, it established that Rahill, who had been clothed with full authority as its agent to purchase items of the class stated, acted within the scope of his implied or apparent or ostensible authority in buying the pumps. No doctrine is better settled than that a principal is bound by the act of his appointed or recognized agent when it is within that sphere. Concretely, if the principal has held out that an agent is authorized to buy goods for him he is bound by the purchases made which are fairly and reasonably within the class specifically authorized and within the apparent scope of the authority where the seller is ignorant of any limitations upon the character of goods to be bought or the scope of authority. Mechem, 908, 921; H. Herman Sawmill Company v. Bailey, 58 S. W. 449, 22 Ky. Law Rep. 552. It matters not that the agent acts contrary to the instructions of his principal where a third person with whom he deals is ignorant of his circumscribed authority or has no reason to believe he is exceeding it or violating the instructions of his principal. Mechem, Section 710; 2 Am. Jur., Agency, Section 99; Nolin Milling Company v. White Grocery Company, 168 Ky. 417, 182 S. W. 191; Empire Coal Mining Company v. Empire Coal Company, 183 Ky. 699, 210 S. W. 474. The technical distinctions between implied, apparent and ostensible authority (Mechem, Section 720) are immaterial where an innocent third party dealt with the agent as such and would suffer loss were the principal allowed to escape from the consequences of agency or of the situation which he caused or permitted. Mechem, Agency, Section 710; 2 C. J. 444, 461; 2 C. J. S., Agency, Sections 23, 29; Louisville Cement Company v. Clell Coleman & Sons, 222 Ky. 183, 300 S. W. 633. One cannot act through another person and then successfully claim that such person is not his agent. Roesener v. Burdette, 208 Ky. 137, 270 S. W. 731. The public has the right to conclude that a corporation or an individual acting through another person has given him the power and authority which naturally and properly belong to the character in which the agent is held out, and may rely upon his having such authority as is suggested by the ordinary habits and experiences of mankind. Mechem, Sections 709, 710. If this were not the rule, commercial relations would be constantly disturbed and chaos result. The law of es-

toppel steps in to prevent the escape from liability, for by his action or conduct—affirmative or negative—he induced or permitted the third person to put his trust in the agent's representations. Kentucky-Pennsylvania Oil & Gas Corporation v. Clark, 247 Ky. 438, 57 S. W. (2d) 65; Mechem, Section 722 et seq.; 2 C. J. S., Agency, Section 29(b); 2 Am. Jur., Agency, Section 105. We are of opinion, therefore, that the court properly found the Red Cross to be liable for the value of these pumps as a matter of law.

We have not overlooked appellant's argument that the pumps were acquired by the Welfare Department of the City of Louisville and that the letter of January 25th addressed to the Chairman of the Mayor's Committee by the representative of the Red Cross expressly excluded liability for anything purchased for the city departments. Though the Mayor's Committee of volunteers was sometimes referred to as the "Welfare Department," it is manifest that it was not the official body of the municipality but merely a designation of a division of the emergency relief service. While John R. Lindsay, City Director of Finance, testified he conferred with Rahill and was present when he ordered the pumps over the telephone, it is too extreme to say that he thereby constituted Rahill a lawful purchasing agent whose act bound the municipality.

Nor have we overlooked appellant's contentions of error in the admission and rejection of evidence. Under the views taken, it is, of course, not necessary to consider the rulings. In arriving at our conclusions we have regarded only what seemed to be competent evidence.

The price which the Brandeis Machinery & Supply Company charged for the pumps was less than that ordinarily charged; and, while it is foreign to the case, it may be said that the factory in Ohio, which successfully got the pumps into the city through the flood areas, sent a substantial check for the relief of the distressed community.

The judgment is affirmed.

Whole court sitting.

Judges Thomas and Cammack dissent, being of opinion the case should have been submitted to the jury.