## Ohio Oil Co. v. Smith-Haggard Lumber Co. et al.

Nov. 11, 1941.

Hunt, Bush & Lisle and R. H. Fletcher for appellant.

J. Owen Reynolds, William B. Gess and Job D. Turner, Jr., for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

The appeal is from judgments aggregating $4,607.62 in favor of four building contractors against the Ohio Oil Company and the adjudication of mechanics' and materialmen's liens for a total of $3,751.33 on its property. Judgment for the full sum was also rendered against Warner Sayers, Incorporated, and liens adjudged against its property for $856.29, but it does not appeal.

Following negotiations looking to the establishment in Lexington of a sales agency for the products of the Ohio Oil Company by Warner Sayers and an associate, on March 12, 1936, the company and Sayers entered into a contract agreeing that the company would spend not in excess of $21,000 for improving a lot it had recently purchased on the corner of South Broadway and Bolivar Street, and that Sayers would bear the balance of the cost of the improvements. It was contemplated, as stated in the contract, that after the improvements had been completed Sayers would buy the property "pursuant to terms already agreed upon." Sayers contracted to deposit in a bank "a sum equal to the difference between $21,000 and the total cost of improvements and real estate after the full and complete making of the plans and specifications and the awarding of contracts." It seems to have been already agreed that Sayers would put up $10,000. As a matter of fact he did not put up any money, and spent only about $600. Sayers organized a corporation, styled "Warner Sayers, Incorporated," and it purchased a 36-foot lot adjoining the oil

company's property with a view of having it used in connection with and as a part of the plant. The evidence is contradictory as to whether the oil company agreed to purchase a substantial portion of the stock of the new corporation; but that seems irrelevant.

Sayers alone, acting for his corporation and for the Ohio Oil Company, procured the services of an architect, Robert W. McMeekin. Under a written contract with the Ohio Oil Company he prepared plans and specifications for the erection of a gasoline service station and an office building and for the remodeling of a warehouse on the premises. His employment did not embrace supervision of the work but it was understood that he would interpret the plans and specifications. They called for the development of the Sayers lot as a part of the whole, making it appear as one although, as we understand, there was no building on it. With the approval if not the express authority of the oil company, the architect procured bids for the work. When it was found that the total cost would be around $45,000, the oil company's engineer in charge, F. K. Burnap, its architect, McMeekin, and Sayers, in consultation with a representative of the Smith-Haggard Lumber Company, which had bid on the general contract, worked out a plan which omitted much of the contemplated improvements and brought the cost within $13,000, which sum had been allocated by the oil company for the purpose. A written contract was made by the lumber company and the oil company and bond executed for its performance. Similar contracts were also made with certain subcontractors. During the progress of the work Burnap was in charge; but it is very clear that Sayers also was quite active in the supervision. The architect was consulted from time to time and his directions were regarded. These contracts were completed in the late fall of 1936, or perhaps in December of that year, and all accounts settled by the oil company. The office building had not been started and, as we understand, but little work had been done on the warehouse, which was used for a bulk station. It was left without lighting facilities. The curbing and sidewalks for the service station were not completed. Only crushed rock had been used in part as driveways. The evidence is not in accord as to the completion of the plumbing. Sayers took possession and began operating the business in December.

Early in 1937, Sayers asked the architect to obtain prices for finishing the filling station according to the original plan and doing a limited amount of work on the warehouse. This consisted of a new roof, certain changes in the walls and painting it. Some electrical work was also called for. Sayers made an oral contract with the Smith-Haggard Lumber Company as a general contractor, and in the same manner it sublet portions of the work. They had done the original work. The contract for the roofing of the warehouse was made directly with the company which did the work. During the progress of these repairs and improvements the architect was advised with and Sayers was very active in the supervision. Neither Burnap, who had supervised the original work, nor any other representative of the Ohio Oil Company was on the ground. The contractors' relations were altogether with Sayers and McMeekin, the architect. When the work had been completed, in March or April, 1937, and bills were sent in the oil company denied liability on the ground that it had not authorized the contracts either directly or indirectly. The contractors gave notice and filed statements asserting liens as provided by Sections 2463 and 2468 of the Statutes. Adhering to its disavowal of liability, suits were instituted and prosecuted against the oil company to judgment as above stated.

The foregoing statement is made to show the transactions with the contractors and the extent of their knowledge of the relationship of the oil company and Sayers. However, the contractors knew nothing whatever about the contract between those parties made in March, 1936. Nor did they have any notice or knowledge of a later contract and lease, made in December, 1936, in which it was agreed that all prior agreements were cancelled and "held for naught." By this instrument the property was leased to Warner Sayers, Incorporated, for five years for stipulated monthly rentals. The lease gave the Sayers corporation an option to purchase the property for $26,332 on prescribed terms. Sayers testified that the work done in 1937 had been expressly authorized by the sales department of the Ohio Oil Company and that some of the representatives of that department while in Lexington saw the improvements being made. That is denied. Whether they were or not does not seem material for the contractors had

had nothing to do with the sales department and it had had nothing to do with the construction work. True it is that the architect proceeded on the sole request and authority of Sayers. But he had never been advised by the Ohio Oil Company that it had abandoned the completion of the program or plan as originally designed. He understood it had only been deferred.

We think the case should be decided upon the hypothesis that the Ohio Oil Company did not expressly authorize the work or the making of the contracts forming the basis of the suits. We do not think this is a case of implied agency in the sense of being an actual agency established by deduction from the facts, for as between the parties there could have been no implied contract after the execution of the express contract in December, 1936. Cf. Kentucky-Pennsylvania Oil & Gas Corporation v. Clark, 247 Ky. 438, 57 S. W. (2d) 65. That, too, would seem to remove the idea of a joint adventure except as the contractors may have been justified in considering it so. They knew in the beginning it was a joint project in that the lots of both parties were to be improved to form a unit and both were active in having it done. If there is any liability on the part of the oil company, it is under the rule of agency by estoppel or an ostensible agency and under the terms of the statute pertaining to mechanic's and materialmen's liens. The facts are to be looked at from the standpoint of the contractors.

This is not a case of limitation of authority of an agent. The question is of liability of a former agent whose authority had actually terminated without the third party having reason to know it. In Middleton v. Frances, 257 Ky. 42, 77 S. W. (2d) 425, 426, we adopted the following definition given in 2 C. J. 427, Section 14:

> "An apparent or ostensible agent is one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, although he has not, either expressly or by implication, conferred authority upon him."

See, also, Kentucky-Pennsylvania Oil & Gas Corporation v. Clark, supra; American National Red Cross v. Brandeis Machinery & Supply Company, 286 Ky. 665, 151 S. W. (2d) 445.

The general rule is that "the acts of an agent after

his authority has been revoked may bind a principal as against third persons who, in the absence of notice of the revocation of the agent's authority, rely upon its continued existence. The general rule is that the acts of an agent, within the apparent scope of his authority, are binding on the principal as against one who had formerly dealt with him through the agent and who had no notice of the revocation. This is especially so with reference to transactions initiated by the agent before the revocation of his authority.'' 2 Am. Jur., Agency, Section 44. This statement is supported by Globe & Rutgers Fire Ins. Co. v. Porter, 218 Ky. 163, 291 S. W. 6, and National Deposit Bank of Owensboro v. Ohio Oil Company, 250 Ky. 288, 62 S. W. (2d) 1048. The appellant could have saved itself future embarrassment and expense and save these contractors from possible loss in dealing with Sayers by having put to public record the lease executed in December, 1936.

Let us take the place of the contractors in looking at the situation. They knew the oil company owned the corner lot upon which the structures were erected and Sayers the other one. The plans called for the improvement of both as a unit. At the instance of the oil company's architect, its engineer, Burnap, and Sayers, acting together, bids had been submitted for the entire construction. The three men and the contractors had worked out and agreed upon certain eliminations which left the filling station incomplete and without anything being done to the warehouse, although equipment as a bulk station had been put in it. The three of them jointly had supervised the work and given orders, though each in a different degree. When this additional work was done Sayers was in possession of the property and operating the business. There is no denial of the testimony of Hanks, the representative of the lumber company, that when its bid for the entire job had been rejected and it had been decided to do only part of the work he had told the parties that he would not be interested in doing ''just those two little things they wanted done'' unless his firm did the larger portions. Burnap assured Hanks before he signed that contract ''that we would get all of it eventually,'' and, as he testified, ''So then they gave me the contract on this first branch of the work with the promise that when the other work was done I would be entitled to that without having it

re-figured by all the contractors in the city of Lexington.'' Emphasis is laid by the appellant upon the fact that the first work was pursuant to formal written contracts and the company had required a fidelity bond. It is argued that the contractors were therefore negligent in proceeding in 1937 under a verbal contract made by Sayers and at the instance of the architect. The argument is weakened by the fact that the extras furnished in 1936 amounted to $1,849 and they had been authorized by Burnap orally. It was equal to about 30 per cent. of the cost of the work done under the written contract (the oil company having installed the tanks and pumps). When the contractor was called upon by the same architect in the same manner as before to submit prices and Sayers had authorized it to finish the service station according to the plan and to repair the warehouse, though on a modified plan, it seems to us the lumber company was justified in believing the authority which they had exercised just a short while before still existed.

The applicable portion of the statute is this part of Section 2463, viz:

''A person who performs labor or furnishes materials in the erection, altering or repairing a house, building or other structure, or for any fixture or machinery therein, or for the excavation of  *  *  * or for the improvement in any manner of real estate by contract with, or by the written consent of, the owner, contractor, subcontractor, architect, or authorized agent, shall have a lien thereon.''

Where it is sought to sustain a mechanic's lien on the ground that the improvement of property authorized by a tenant by and with the consent of the landlord, the consent must have been in writing. Luigart v. Lexington Turf Club, 130 Ky. 473, 113 S. W. 814; Cincinnati Stucco Co. v. North Kentucky Fair, 218 Ky. 493, 291 S. W. 715; Penney v. Kentucky Utilities Co., 238 Ky. 167, 37 S. W. (2d) 5. This case does not rest on consent of the landlord. It is on a contract with the owner made by its architect and agent.

We do not construe the term ''authorized agent'' to mean only one having an express or implied authority. All the law of agency with respect to binding a party to the act of another, particularly as to the classification

of the agent, must be considered. 40 C. J. 96. This includes an apparent or ostensible agent. Here the circumstances bring Sayers within that classification. There is presented also the exercise of authority by the architect, mentioned in the statute, although he did not actually make the contract.

An important consideration in reaching the decision that the oil company's property is subject to a lien for the value of these improvements is the provision of the Statutes that the trial of an action to enforce the liens of mechanics and materialmen shall be as an equitable proceeding. Section 2471, Statutes. See Rieger v. Schulte & Eicher, 151 Ky. 129, 151 S. W. 395. The reasonableness of the price charged is not questioned. Although the oil company may not have wanted the work done at the time, it received the full benefit of it. Either in good faith or otherwise, Sayers, its apparent agent, committed the company to the payment of the bills. The statute is to be liberally construed to protect one whose material and labor has improved the property of another. Avery & Sons v. Woodruff & Cahill, 144 Ky. 227, 137 S. W. 1088, 36 L. R. A., N. S., 866; Powers v. Brewer, 238 Ky. 579, 38 S. W. (2d) 466. It would be unjust and inequitable to permit the company to retain the benefits and escape payment therefor at the expense of the contractors. It would be contrary to the spirit of the statute to deprive them of their liens.

Wherefore the judgment is affirmed.